UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LUIS MIGUEL TEXEIRA-SPENCER,<br>and OLATUNJI DAWODU,<br><br>Defendants. | Crim. No. 21-145 (JDB) |

## MEMORANDUM OPINION

Defendants Luis Miguel Teixeira-Spencer and Olatunji Dawodu are charged via indictment with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. The charges stem from defendants' involvement in a narcotics trafficking conspiracy which used darknet websites[1] to distribute pills pressed with fentanyl by mail. Following their arrests and a joint detention hearing, a magistrate judge on the United States District Court for the Southern District of Florida ordered both defendants released pending trial and stayed the release order pending appeal. The government now asks this Court to review the magistrate judge's decision and order defendants detained pending trial. For the reasons stated below, the Court concludes that no condition or combination of conditions of release will reasonably assure defendants' appearance and the safety of the community if the defendants are released pending trial, and hence will order them detained.

## Background

On February 22, 2021, a grand jury returned an indictment charging defendants Spencer

---

[1] Darknet markets are commercial websites that are set up as "hidden services" and can only be accessed using the Tor network, which requires installing Tor software. Darknet markets function primarily as black markets for illicit goods and bitcoin is the most common payment method. See Indictment [ECF No. 1] ¶¶ 2–3.

1

and Dawodu with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi).  See Indictment.[2]  These charges arise from defendants' participation in a narcotics trafficking conspiracy which involved using darknet websites to distribute pills pressed with fentanyl via the U.S. Postal Service ("USPS").  Id. ¶¶ 8–12.  The government's proffer in support of pretrial detention is described below.

The Federal Bureau of Investigation ("FBI") and other law enforcement agencies conducted a criminal investigation of a darknet market vendor that operates the moniker "johncarter7."  See Gov't's Mem. at 1.[3]  From around February 2017 until May 2020, johncarter7 sold pills pressed with fentanyl on several darknet markets, including AlphaBay, Wall Street, Dream, and Empire.  Id.  As certain darknet sites were shut down, the vendor turned to new markets.  Id. at 1–2.  Records indicate that johncarter7 sold more than 67,700 pills across the four darknet markets and more through the encrypted messaging application Jabber, receiving payment in bitcoin.  Id. at 2.

While investigating johncarter7, law enforcement found that three of the vendor's darknet sites used the same encryption key and embedded within each key was the same email address.  Id.  That email address was the recovery address for an account on a bitcoin exchange

---

[2] Additionally, on March 1, 2021, a grand jury returned an indictment in Case No. 21-CR-163 charging Dawodu and a third individual, Alex Ogando, with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl.  See Indictment [ECF No. 3], United States v. Dawodu, 21-CR-163 (D.D.C.).  That indictment arose from a related investigation of fentanyl pills sold on the darknet site PolarSprings.  See Gov't's Mem. for Pretrial Detention ("Gov't's Mem.") [ECF No. 7] at 1 n.2.  Following a detention hearing on April 8, 2021, Magistrate Judge Harvey ordered Ogando detained pending trial.  See Min. Entry (Apr. 8, 2021), United States v. Ogando, 21-CR-163 (D.D.C.).

[3] The Court will cite the government's written proffer, but notes that all of these facts are consistent with the oral proffer given during the detention hearing in the Southern District of Florida.  See Tr. of Video Detention & Removal Hr'g Before the Hon. Jared M. Strauss, U. S. Magistrate Judge ("Mag. Hr'g Tr.") [ECF No. 8-1] at 7–16.  These facts are also reflected in the "manner and means" and "overt acts" section of the indictment.  See Indictment ¶¶ 8–25.

(Localbitcoins.com) with the username "johncarter777." Id. at 3. An individual who traded cash for bitcoin with johncarter777 in-person several times identified Spencer's photograph as depicting the person he met with. Id. That same individual traded bitcoin with Spencer under another handle, and records for that handle include Spencer's name, phone number, and email address. Id. Further, records from another bitcoin exchange (Coinbase) show that bitcoin proceeds from johncarter7 were used on Expedia to pay for a May 2017 hotel stay in Fort Lauderdale, Florida, which was reserved under Spencer's name, phone number, and email address. Id. Moreover, in June and December 2019, an undercover officer bought pills directly from johncarter7 using Jabber, submitting payments to provided bitcoin addresses. Id. at 3–4. Law enforcement traced those payments to an account on a bitcoin exchange (Binance) connected to Spencer and accessed from an IP address in his name and at his residence. Id. at 4.

Law enforcement identified one of Spencer's close contacts as Olatunji Dawodu. Id. Records show nearly 1,500 calls between them from June 17, 2019 to November 15, 2020. Id. Through a pole camera, law enforcement captured Spencer and Dawodu bringing in and taking out boxes from a storage unit in Davie, Florida. Id. Law enforcement also observed them together at Spencer's residence and found messages from Spencer on Dawodu's iCloud account that contained bitcoin wallet addresses. Id. In July and August 2019, law enforcement twice observed Dawodu drop packages containing pills at USPS boxes. Id. After contacting the intended recipients, law enforcement confirmed that the packages were ordered from johncarter7 on Empire and contained fentanyl pills similar to those purchased undercover from johncarter7. Id. at 4–5. Additionally, a confidential human source purchased pills directly from Dawodu several times— including in May and October 2020 and January 2021—that were consistent with the pills in the packages Dawodu dropped at USPS boxes. Id. at 5.

On February 23, 2021, following the Indictment, law enforcement executed search warrants at both defendants' residences in Fort Lauderdale. Id. From Dawodu's residence, law enforcement recovered electronic devices, approximately 1,400 grams of pills containing suspected fentanyl, and around thirty USPS mailing envelopes. Id. The pills and packaging were consistent with those from the johncarter7 undercover purchases and the packages law enforcement observed Dawodu drop at USPS boxes. Id. at 7. From Spencer's residence, law enforcement recovered more than $12,000, digital devices, and ledgers. Id.[4]

On that same day, defendants were arrested in the Southern District of Florida. See Arrest (Feb. 23, 2021), United States v. Spencer, 21-MJ-6099 (S.D. Fla.); Arrest (Feb. 23, 2021), United States v. Dawodu, 21-MJ-6100 (S.D. Fla.). During a recorded jail call shortly after his arrest, Spencer directed his girlfriend to "get rid of" laptops that the FBI missed during their search of his residence. Gov't's Mem. at 8. On February 24, 2021, defendants appeared before Magistrate Judge Jared M. Strauss in the Southern District of Florida and were temporarily detained at the government's request. See Min. Entry (Feb. 24, 2021), Spencer, 21-MJ-6099 (S.D. Fla.); Min. Entry (Feb. 24, 2021), Dawodu, 21-MJ-6100 (S.D. Fla.).

After several continuances, Judge Strauss held a detention hearing on March 31, 2021. See Mag. Hr'g Tr. The government provided an oral proffer and testimony by an FBI agent involved in the investigation. Id. Judge Strauss ordered both defendants released pending trial, finding that certain conditions of release could reasonably assure the defendants' appearance and the safety of the community. Id. at 56, 72–73. Specifically, Judge Strauss ordered both defendants released on

---

[4] That same day, law enforcement also executed a search warrant at the Providence, Rhode Island residence of Alex Ogando, Dawodu's co-conspirator in Case No. 21-CR-163 who the government has described as a "known associate" of both Dawodu and Spencer. Gov't's Mem. at 7. From Ogando's residence, law enforcement recovered more than 1,770 grams of pills containing fentanyl, about $370,000, a money counter, electronic devices, and about thirty USPS Priority Mail envelopes with filled pill orders. Id. at 7–8.

bond into home detention on GPS monitoring, with Spencer to reside with a cousin and aunt in Providence, Rhode Island and Dawodu with a friend in Miami. Id. at 56–58, 73–75. At the government's request, Magistrate Judge Strauss stayed the release order pending appeal. See id. at 62, 76. Later that day, the government moved for revocation of the release order. See Mot. for Emergency Review & Appeal of Release Order ("Gov't's Mot.") [ECF No. 6]. All parties submitted memoranda on the motion, and the Court conducted a hearing on April 16. The government's motion is now ripe for decision.

## Legal Standard

When a defendant is ordered released by a magistrate judge, the government may file "a motion for revocation of the order or amendment of the conditions of release" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(a)(1). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's release or detention order is subject to de novo review. See United States v. Hunt, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has adopted this view, see United States v. Louallen, 2019 WL 1003531, at *1 (D.D.C. Feb. 27, 2019) (Bates, J.), and the government agrees that this is the appropriate standard, see Gov't's Mot. at 4. See also United States v. Chrestman, -- F. Supp. 3d --, 2021 WL 765662, at *5–6 (D.D.C. Feb. 26, 2021) (Howell, C.J.) (explaining why "both the [Bail Reform Act] and the Federal Magistrates Act support the conclusion, reached by every circuit to have considered question, that a district court reviews a magistrate judge's pretrial release or detention order de novo").

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes

5

that are 'the most serious' compared to other federal offenses." United States v. Singleton, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting United States v. Salerno, 481 U.S. 739, 747 (1987)).  Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, id. § 3142(f)(2)(A)–(B).  A subset of the types of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses.  18 U.S.C. § 3142(e)(3).

If a defendant is eligible for a detention hearing, the BRA provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. § 3142(e)(1).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019).  Pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight.  United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987).  To justify detention on the basis of dangerousness, the government must establish by clear and convincing evidence that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions.  United States v. Munchel, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting Salerno, 481 U.S. at 751).

To decide whether pretrial detention is warranted, the court must "take into account the available information concerning" four statutory factors: (1) "the nature and circumstances of the

offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).

## Analysis

To start, defendants are eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(C), which authorizes pretrial detention in cases that involve "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." Defendants do not dispute that the Controlled Substances Act offense charged here meets these criteria. See 21 U.S.C. § 841(b)(1)(A)(vi).

Moreover, because the charged offense here is "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," it triggers a rebuttable presumption that no conditions will reasonably assure the defendant's appearance and protect the community if the Court finds there is probable cause to believe the defendant committed the offense. 18 U.S.C. § 3142(e)(3)(A). The indictment alone establishes probable cause and triggers the presumption. See, e.g., United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("The indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). The government may also support that presumption by proffer, id., and all parties agreed during this Court's detention hearing that the presumption applies.

The Court concludes that defendants have not presented sufficient evidence to rebut the presumption. Moreover, after considering the presumption and the § 3142(g) factors discussed below, the Court concludes that detention is warranted.

A.     **Nature and Circumstances of the Offense**

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Here, the offense is extremely serious. A grand jury has found probable cause to believe that defendants were involved in a sophisticated conspiracy to distribute more than 400 grams of a mixture and substance containing fentanyl—which carries a ten-year mandatory minimum and a maximum sentence of life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(vi). As noted above, Congress enacted a statutory presumption in favor of pretrial detention for those charged with serious drug trafficking offenses—demonstrating that Congress recognized the risks posed by such defendants. Furthermore, the quantity of fentanyl distributed by johncarter7 greatly exceeds that required for the mandatory minimum; the quantity recovered from Dawodu's residence alone is more than three times the qualifying amount. See Gov't's Mem. at 12. Fentanyl distribution poses a grave danger to the community, especially in recent months. See, e.g., Abby Goodnough, Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows, N.Y. Times (Apr. 14, 2021), https://www.nytimes.com/2021/04/14/health/overdose-deaths-fentanyl-opiods-coronaviurs-pandemic.html (noting that fentanyl is the primary driver for a twenty-nine percent rise in overdose deaths from October 2019 through September 2020 compared with the previous twelve-month period).

Because defendants are subject to a lengthy period of incarceration if convinced, they have an incentive to flee. The circumstances of this offense suggest they might have the means to do so. Defendants have access to virtual currency and are familiar with darknet markets that sell not only drugs but also false identification and weapons. Indeed, during the search of Dawodu's residence, law enforcement recovered a false Illinois driver's license with the name "Jason Richmond." See Suppl. To Gov't's Mem. for Pretrial Det. ("Gov't's Suppl. Mem.") [ECF No. 11]

at 1–2.[5] And despite Dawodu's claim that there is no direct evidence of him using cryptocurrency, there is evidence on Dawodu's iCloud of Spencer sending him bitcoin wallet addresses. See Mag. Hr'g Tr. at 41:20–43:19.

While Spencer admits that "the offense was serious given its involvement with Fentanyl," see Spencer's Mem. at 2, Dawodu claims that his role in the alleged conspiracy was "minimal," see Dawodu's Mem. at 2. But the facts disprove Dawodu's assertion: more than 1,400 grams of pills (approximately 12,590 pills) were found in his bedroom and law enforcement observed him both drop packages for johncarter7 and ship pills directly to customers, including a confidential human source. See Gov't's Suppl. Mem. at 2–3.

Hence, the Court finds that the nature and circumstances of the charged offense weigh heavily in favor of detention for both Spencer and Dawodu.

B.     The Weight of the Evidence

The weight of the evidence that Dawodu and Spencer were involved in the alleged conspiracy is fairly strong. To be sure, the nature of this conspiracy renders prosecution quite difficult. Because the alleged conspiracy involved sophisticated co-conspirators operating on the darknet with virtual currency and encryption tools to evade detection by law enforcement, it is hard to attribute the criminal activities to individuals. But here, as detailed in the background section above, the government has presented ample evidence.

With respect to Dawodu, the government observed him drop packages containing fentanyl pills at USPS boxes whose intended recipient confirmed the pills were purchased from johncarter7. A confidential source purchased fentanyl pills directly from Dawodu, and approximately 1,400

---

[5] At the detention hearing, Dawodu's attorney stated that he did not believe the picture on the fake driver's license depicted Dawodu. Regardless of whether it does, Dawodu's possession of any counterfeit identification card suggests he has access to fake identification.

grams of pills containing suspected fentanyl and 30 USPS mailing envelopes were found in his residence. Additionally, the government has extensive records of his communications and meetings with Spencer, including their exchange of bitcoin wallet addresses.

As for Spencer, the government linked his email address, photograph, and a hotel reservation made in his name to johncarter7. Law enforcement also traced an undercover purchase of fentanyl from johncarter7 to a bitcoin exchange account connected to Spencer and accessed from an IP address in Spencer's name and at his residence. Further, the search of his residence uncovered a large amount of cash and ledgers. Spencer attempts to cast doubt on the evidence against him by arguing that "[w]hile there were bitcoin transactions linked back to Spencer's bitcoin account and email, the government was not able to say whether a review of the bitcoin transactions matched up with actual dates that drug transactions took place" or "how many people other than Spencer had access to that same bitcoin (Coinbase) account." See Spencer's Mem. at 4 (internal citation omitted). He also argues that no purchasers or informants identified him as a seller, no narcotics were found in his house, and he was never seen with Dawodu during mail drops. Id. The government persuasively rebutted these points in its supplemental memorandum and during the detention hearing. Although Spencer apparently relied on others to mail the narcotics, he played an integral role in the conspiracy. See Gov't's Suppl. Mem. at 4–5. In addition to the evidence already discussed, Spencer purchased bitcoin to pay for orders of at least 610 grams of furanylfentanyl on the darknet site Alphabay in 2016 and searches observed in his email address reflect searches for fentanyl analogues close in time to several of these purchases. Id. at 4. Spencer's IP address records also reveal that he accessed the darknet and encrypted messaging platforms: he connected to the Tor network, which is how darknet markets are accessed, and connected to the Jabber server during the time when johncarter7 was directing customers to

contact the vendor directly via Jabber. Id. at 5. And although Spencer did not sell drugs in-person, he did trade bitcoin for cash in person with a trader who found him using the johncarter777 moniker. Id. Finally, while Spencer was not observed dropping packages with Dawodu, they were observed together carrying packages to and from a storage unit and were in frequent contact. Id.

In sum, this factor weighs in favor of detention, although it "is the least important." See United States v. Gebro, 948 F.2d 1118, 1121–22 (9th Cir. 1991).

C. **History and Characteristics of the Defendant**

Both defendants' history and characteristics are mixed but tilt in favor of detention. As part of this factor, the Court considers defendants' "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Neither defendant has a significant criminal history. In 2017, Spencer pled guilty to one misdemeanor for obtaining money under false pretenses in Rhode Island. See Ex. 1, Spencer's Mem. at 3–4. While the pretrial service report states that Dawodu has a charge in Butts County, Georgia for marijuana possession, the district attorney's office told Dawodu's counsel that no case was ever filed under his name or the citation number provided, and prosecution never commenced. See Dawodu's Mem. at 2; Mag. Hr'g Tr. at 68:2–10. Notably, however, the indictment here charges defendants with a years-long conspiracy that was able to evade detection by law enforcement by using electronic tools designed specifically to conceal illegal activity.

Both defendants have significant ties to both the United States and foreign countries. While Spencer is from Cape Verde and has no legal status in the United States, he has been here since he was eleven years old. Spencer's Mem. at 3. He has a girlfriend in South Florida, and a cousin and

aunt in Rhode Island whom he would reside with if released. Id.; Mag. Hr'g Tr. at 49:13–14. But his mother is in Cape Verde, Mag. Hr'g Tr. at 54:2–3, and he has an immigration detainer currently in place. See Ex. 1, Gov't's Mem. [ECF No. 7-1]. While Spencer has sought to remain here through the DACA program, and says he will fight deportation, he may not be given the choice. See Mag. Hr'g Tr. at 55:21–56:1. Spencer argues that his immigration detainer actually "takes away any risk of flight because Spencer first must obtain a ruling [from] DHS, at a minimum, which grants him an immigration bond prior to even being able to be released in the instant case on bail." Spencer's Mem. at 3. This argument is unavailing because if this Court orders Spencer released and he then receives an immigration bond, he could still flee to avoid prosecution in this case. Moreover, Spencer's call to his girlfriend after his arrest, in which he directed her to get rid of laptops the FBI inadvertently left behind, suggests that he is willing to obstruct justice.

Dawodu was born in Nigeria but came to the United States in 2005 and has been a naturalized citizen since 2011. See Dawodu's Mem. at 2. He has close friends in South Florida, including a friend he would reside with if released, a girlfriend in Atlanta, and a sister in Maryland. Id. at 2–3. But he has substantial ties to Nigeria, too, including his parents and siblings who live there. See Mag. Hr'g Tr. at 67:11–16. He also buys and exports cars, suggesting possible business relationships with people abroad. Id. at 68:11–17. Dawodu claims that he is not a flight risk because he voluntarily surrendered his passports to a probation officer on March 29, 2021 and because he does not have the financial resources to flee. Id. at 3. Yet agents discovered his fake driver's license, which suggests an attempt to evade law enforcement and raises the possibility he could flee using false identification. See Gov't's Suppl. Mem. at 1–2. And because Dawodu has exchanged bitcoin wallet addresses with Spencer, he might very well have access to virtual currency.

Hence, while both defendants have limited criminal histories and the Court believes they wish to remain in the United States, their flight risk cannot be dismissed given their foreign ties, possible access to the darknet and cryptocurrency, history of evading law enforcement, and incentive to flee. The Court therefore concludes that both defendants' history and characteristics counsel against release.

### D. Nature and Seriousness of the Danger

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires "an 'open-ended assessment of the "seriousness" of the risk to public safety.'" United States v. Cua, Crim. A. No. 21-108 (RDM), 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (quoting United States v. Taylor, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).

As set forth above, defendants' role in a large-scale fentanyl distribution conspiracy showed an obvious disregard for the safety of others. Fentanyl is extraordinarily dangerous and this operation distributed a massive amount. Congress recognized the high risk of recidivism for those involved in serious drug offenses by creating a statutory presumption in favor of detention, and defendants have not presented any compelling evidence to rebut that presumption here. Defendants argue that they have no history of violence. See Dawodu's Mem. at 2; Spencer's Mem. at 4. Even if true, that does nothing to allay the dangers stemming from fentanyl distribution.

This Court respectfully disagrees with Magistrate Judge Strauss's conclusion that there is a combination of conditions that can be imposed to reasonably assure the safety of the community. See Mag. Hr'g Tr. at 56, 72. As Judge Strauss acknowledged, Spencer poses a "substantial risk" of continuing his criminal activity on home detention "because he was apparently able to conduct

13

all of the alleged activity from his home and through the dark net, which is difficult to monitor." Id. at 56:2–7.  And while Dawodu's activity involved leaving the home to travel to USPS drop boxes, he could become involved with a different part of the conspiracy or direct others to drop packages for him.  The Court disagrees with Judge Strauss's view that "the lack of criminal history involved suggests . . . there's not substantial evidence here that [defendants are] not going to be deterred by the significant conditions of bond."  Id. at 56:7–11.  Fentanyl sales are lucrative and defendants' use of cryptocurrency, the darknet, and encrypted applications over a lengthy period of time demonstrate their ability to operate the conspiracy without detection out of their homes.  No combination of conditions could effectively mitigate that danger.  Even if pretrial services can monitor internet use to some extent, it has no meaningful way to prevent defendants from using sophisticated tools to evade detection.  For example, as the government suggested during the detention hearing, defendants could access the darknet or virtual currency using devices owned by others in their households.  Indeed, Judge Strauss did not impose any internet restrictions at all precisely because he was "not sure" how defendants' access to darknet services could "actually be monitored."  Id. at 60:1–10.

Because there is a significant risk that defendants will continue their criminal activity on home detention, they pose a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions.  See Munchel, 2021 WL 1149196, at *4 (quoting Salerno, 481 U.S. at 751).  Therefore, in addition to finding by a preponderance of evidence that there is a risk of flight, the Court finds by clear and convincing evidence that both defendants pose a substantial prospective threat to the community.

## Conclusion

For the reasons explained above, the Court finds that all four statutory factors weigh in

favor of pretrial detention. Therefore, the Court will grant the government's motion for emergency review and appeal of release order, and order defendants detained pending trial. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: April 19, 2021