# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>LUIS MIGUEL TEIXEIRA-SPENCER<br><br>_____<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | **Case: 1:21-cr-00145**<br>**Assigned to: Judge John D. Bates**<br>**Assign Date: 2/22/2021**<br>**Description: INDICTMENT (B)** |

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    LUIS MIGUEL TEIXEIRA-SPENCER
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☐ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 846 - Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl.

2021.02.22
16:27:30 -05'00'

Date:    02/22/2021    _____
*Issuing officer's signature*

City and state:    WASHINGTON, DC    ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* 02/22/2021 , and the person was arrested on *(date)* 02/23/2021<br>at *(city and state)* WILTON MANORS, FLORIDA .<br><br>Date: 02/23/2021    _____<br>*Arresting officer's signature*<br><br>SEAN HAMBLET, SPECIAL AGENT<br>*Printed name and title* |

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk
By _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in January 28, 2021

FILED BY _____ D.C.

FEB 2 4 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | OUR CASE:21-6099-JMS |
| ✓LUIS MIGUEL TEIXEIRA-SPENCER,✓ | : | VIOLATION: |
| and OLATUNJI DAWODU, | : | 21 U.S.C. § 846 |
| | : | (Conspiracy to Distribute 400 grams or More |
| Defendants. | : | of a Mixture and Substance Containing a |
| | : | Detectable Amount of Fentanyl) |
| | : | |
| | : | FORFEITURE: |
| | : | 21 U.S.C. § 853 |

**INDICTMENT**

Case: 1:21-cr-00145
Assigned to: Judge John D. Bates
Assign Date: 2/22/2021
Description: INDICTMENT (B)

The Grand Jury charges that:

At times material to this Indictment:

## DEFINITION OF TERMS

1.      Bitcoin ("BTC") was one type of virtual currency that was circulated over the Internet. Generally, BTC was sent and received using a BTC "address," which was like a bank account number and was represented by a case-sensitive string of numbers and letters. Little to no personally identifiable information about the sender or recipient was transmitted in a BTC transaction itself.

2.      Darknet markets were commercial websites located within the Tor network's hidden services that could only be accessed using Tor. To access the Tor network, a user had to install freely-available Tor software. Within the Tor network, entire websites were set up as "hidden services." A user could only reach these "hidden services" if the user was using the Tor software and operating in the Tor network.

3. Darknet markets functioned primarily as black markets, selling or brokering transactions involving drugs, weapons, stolen credit card details, and other illicit goods. BTC was the most common method of payment for products or services within darknet markets.

4. AlphaBay Market, Dream Market, Empire Market, and Wall Street Market, were, at various times, popular darknet markets widely used by individuals in the United States and elsewhere to buy and sell illegal narcotics.

**COUNT ONE**
**(Drug Distribution Conspiracy)**
21 U.S.C. § 846

5. Paragraphs 1 through 4 are incorporated herein.

6. Beginning on or about February of 2017, and continuing through on or about February of 2021, within the District of Columbia and elsewhere, the defendants, **LUIS MIGUEL TEIXEIRA-SPENCER and OLATUNJI DAWODU**, did knowingly conspire, with others known and unknown to the Grand Jury, to knowingly and intentionally distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi).

OBJECTS OF THE CONSPIRACY

7. The objects of the conspiracy were, in substance, as follows:

    a. to traffic narcotics;

    b. to use cryptocurrency and the darknet to conceal the co-conspirators' illicit activities; and

    c. to enrich the co-conspirators from the trafficking of narcotics.

2

8.     **LUIS MIGUEL TEIXEIRA-SPENCER** sold narcotics, including fentanyl, on numerous darknet markets, including AlphaBay, Dream, Wall Street, and Empire in exchange for BTC.

9.     **LUIS MIGUEL TEIXEIRA-SPENCER** utilized the online moniker "johncarter7" on darknet markets, and used variations of the name, including "LBC Johncarter777" on BTC exchanges.

10.     For example, between in or about February 2017 until Apil of 2020, **LUIS MIGUEL TEIXEIRA-SPENCER** advertised the sale of pills on AlphaBay, Dream, Wall Street, and Empire using the moniker "johncarter7." The pills were frequently described as "oxycodone M30," but some of the advertisements stated that the pills in fact contained fentanyl. For instance, on Wall Street, johncarter7 advertised for sale "oxycodone M30 best in the market," with a listing describing that "these pills are pressed with just the right amount of fentanyl no hot spots to overdose solid product all the way around I been around for years since alpha bay days those that know me same product as before MONEY BACK GUARANTEE."

11.     Johncarter7's darknet sales were conducted as follows:

a.     The vendor sites would be set up on different darknet markets and were linked through a common email connected to **LUIS MIGUEL TEIXEIRA-SPENCER**;

b.     Customers would place orders for pills through the darknet market and could communicate with johncarter7 using encrypted messaging;

c.     **LUIS MIGUEL TEIXEIRA-SPENCER** and **OLATUNJI DAWODU** would obtain packaging and shipping materials;

3

d.    **OLATUNJI DAWODU** would place packages for orders that had been placed over the darknet market in blue boxes or post offices operated by the U.S. Postal Service ("USPS");

e.    Packages were typically sent using USPS Priority Mail, with postage that had been paid for in bitcoin;

f.    The packages were sent from both South Florida, as well as the Rhode Island area, to buyers across the country, including purchasers in the District of Columbia; and

g.    Once the shipments were received by the customer, the darknet market would release funds in BTC, which were held in escrow until the transaction was completed, into the johncarter7 account on the darknet market.

12.    **LUIS MIGUEL TEIXEIRA-SPENCER** also communicated with customers through messaging services, such as Jabber. Jabber is an instant messaging service that enables real-time communication between users. Using Jabber, **LUIS MIGUEL TEIXEIRA-SPENCER** would arrange direct transactions with customers, wherein he would communicate with buyers directly regarding shipments of drugs; after receiving bitcoin payment from customers, packages would then be shipped to the customers using the U.S. Postal Service. The packages were shipped in a similar manner as the orders that had been placed on the darknet markets.

## OVERT ACTS

13.    The defendants and co-conspirators, known and unknown to the Grand Jury, committed, and caused to be committed, the following overt acts, amongst others, in furtherance of the conspiracy.

4

14.     In setting up the johncarter7 vendor sites on Dream, Wall Street, and Empire Markets, an email account connected to **LUIS MIGUEL TEIXEIRA-SPENCER** was embedded within the public key for vendor accounts on each of the three markets.

*Undercover Purchases from Darknet Markets*

15.     During the course of this investigation, a number of undercover purchases of pills were made, to include:

| Date | Market | Pills Ordered | Controlled Substance |
|------|--------|---------------|----------------------|
| 3/19/19 | Dream | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 3/27/19 | Wall Street | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 4/12/19 | Wall Street | 10 | fentanyl |
| 6/12/19 | Empire | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 6/19/19 | Empire | 50 | fentanyl and acetyl fentanyl, a fentanyl analog |

16.     Each of the packages from johncarter7 was shipped via USPS Priority Mail envelopes and packaged in a similar fashion, with labels affixed that displayed return addresses with fictitious names and addresses.

*Direct Purchases from Johncarter7 Using Jabber*

17.     In April 2019, johncarter7 posted a Jabber account username on the Wall Street vendor page for future orders. By posting the Jabber contact information, johncarter7 allowed customers to make purchases directly from the vendor, rather than having to place orders through the vendor page.

18.     In late April of 2019, undercover officers began communicating with johncarter7 using the Jabber account and arranged multiple purchases of narcotics, including the following:

5

| Date | Pills Ordered | Controlled Substance |
|---|---|---|
| 4/24/19 | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 5/8/19 | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 5/14/19 | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 6/28/19 | 20 | results pending |
| 7/15/19 | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 12/9/19 | 30 | fentanyl and heroin |

19. Each of the packages purchased by the undercover officer using the Jabber messaging application contained pills that were packaged in a similar fashion to the undercover purchases from johncarter7 on the darknet markets.

*SPENCER's Connection to Proceeds of Johncarter7 Pill Sales*

20. The proceeds from certain illicit purchases conducted by johncarter7 were withdrawn to a Bitcoin address ending in 4MW9. That Bitcoin address was linked to more than 100 additional Bitcoin addresses; one of those linked addresses was used to deposit Bitcoin to a Coinbase address on or about May 27, 2017. The deposit was used to process a payment to Expedia for a hotel reservation in Fort Lauderdale, Florida. The traveler's name was **LUIS MIGUEL TEIXEIRA-SPENCER,** with a phone number and email connected to **LUIS MIGUEL TEIXEIRA-SPENCER.**

21. During the undercover purchase on June 28, 2019, johncarter7 provided the undercover officer with a Bitcoin address ending in LmNP to make the payment for the illicit narcotics. During the undercover purchase on December 9, 2019, johncarter7 provided the undercover officer a Bitcoin address ending in DWYF to make the payment for the illicit narcotics. The transactions in June and December of 2019 were ultimately transferred to a Binance account registered with **LUIS MIGUEL TEIXEIRA-SPENCER's** known email address. The Binance

6

account that received the johncarter7 proceeds was accessed more than one hundred times from an IP address in the name of **LUIS MIGUEL TEIXEIRA-SPENCER** at the address where **LUIS MIGUEL TEIXEIRA-SPENCER** was living at the time.

*Johncarter7 Shipments*

22.     On or about July 17, 2019, **OLATUNJI DAWODU** deposited USPS Priority Mail envelopes in a USPS mailbox. The packages contained pressed pills and were addressed to individuals located in Connecticut and Colorado. The intended recipients of the two packages confirmed that the pills had been purchased from johncarter7 on the Empire Market.

23.     On or about August 27, 2019, **OLATUNJI DAWODU** made another deposit of packages at a USPS mailbox. Law enforcement seized one package for further investigation and determined that it contained pills similar in appearance to the pills purchased during the undercover and darknet market purchases described above.

*Use of Storage Facility*

24.     On or about September 17, 2019, **LUIS MIGUEL TEIXEIRA-SPENCER** sent **OLATUNJI DAWODU** a message with the address of a storage unit located in Davie, Florida.

25.     **OLATUNJI DAWODU** and **LUIS MIGUEL TEIXEIRA-SPENCER** frequented the storage facility in Davie, Florida. A camera captured **OLATUNJI DAWODU** and **LUIS MIGUEL TEIXEIRA-SPENCER** appearing to use the facility in furtherance of the conspiracy.

(**Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl,** in violation of Title 21, United States Code, Section 846)

7

## FORFEITURE ALLEGATION

1.     Upon conviction of the offense alleged in Count One of this Indictment, the defendants shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violations and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violations. The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the offense.

2.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture**, pursuant to Title 21, United States Code, Section 853(a) and (p))

A TRUE BILL:

FOREPERSON.

*Michael R. Marrimon Dn. M*

Attorney of the United States in
and for the District of Columbia.

*Shedelle Dorsen*

9

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| United States of America | ) | |
|---|---|---|
| v. | ) | **Case: 1:21-cr-00145** |
| | ) | **Assigned to: Judge John D. Bates** |
| OLATUNJI DAWODU | ) | **Assign Date: 2/22/2021** |
| | ) | **Description: INDICTMENT (B)** |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     OLATUNJI DAWODU

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 846 - Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl.

2021.02.22
16:25:56 -05'00'

Date:     02/22/2021

*Issuing officer's signature*

City and state:     WASHINGTON, DC

ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

| Return | |
|---|---|
| This warrant was received on *(date)* | , and the person was arrested on *(date)* |
| at *(city and state)* | |

Date:

*Arresting officer's signature*

*Printed name and title*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

United States of America

v.

LUIS MIGUEL TEIXEIRA-SPENCER

*Defendant*

)
)
)
)
)
)

**Case: 1:21-cr-00145**
**Assigned to: Judge John D. Bates**
**Assign Date: 2/22/2021**
**Description: INDICTMENT (B)**

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     LUIS MIGUEL TEIXEIRA-SPENCER
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☐ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 846 - Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl.

2021.02.22
16:27:30 -05'00'

Date:     02/22/2021

*Issuing officer's signature*

City and state:     WASHINGTON, DC

ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____          _____ *Arresting officer's signature* |
|          _____ *Printed name and title* |



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | | Case: 1:21-cr-00145 |
| **UNITED STATES OF AMERICA** | : | Assigned to: Judge John D. Bates |
| | : | Assign Date: 2/22/2021 |
| v. | : | Description: INDICTMENT (B) |
| | : | |
| **LUIS MIGUEL TEIXEIRA-SPENCER,** | : | **VIOLATION:** |
| **and OLATUNJI DAWODU,** | : | **21 U.S.C. § 846** |
| | : | **(Conspiracy to Distribute Controlled** |
| **Defendants.** | : | **Substances)** |
| | : | |

## ORDER

Upon consideration of the motion to seal the indictment, arrest warrants, and other related

material, it is this 22ⁿᵈ day of February 2021,

**ORDERED,** that the Government's Motion is hereby **GRANTED** and the indictment,

arrest warrants, and other related material be sealed until further order of the Court.

Notwithstanding the sealing, the government may disclose these material in furtherance of its law

enforcement and prosecution needs and discovery obligations.



2021.02.22
16:27:59 -05'00'

Zia M. Faruqui
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY_____D.C.

**FEB 2 4 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

UNITED STATES OF AMERICA
Plaintiff

vs

Case No:21-6099-STRAUSS

LUIS TEXEIRA-SPENCER
Defendant

## ORDER

THIS CAUSE is before the Court for the initial appearance of the above-named defendant(s) on a SEALED INDICTMENT filed in the District of Columbia.

UPON ORAL motion of the government in open court that the SEALED INDICTMENT be unsealed as to all the defendants, it is hereby ORDERED AND ADJUDGED that the Sealed Complaint be unsealed as to all parties in this case.

DONE AND ORDERED at Fort Lauderdale, Florida this 24th day of February, 2021.

_____

JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record

17

UNITED STATES DISTRICT COURT FOR SOUTHERN DISTRICT OF FLORIDA **COURT ORDER/MINUTES**

U.S. MAGISTRATE JUDGE JARED M. STRAUSS- FORT LAUDERDALE, FLORIDA (VIA ZOOM)

| | |
|---|---|
| DEFT: LUIS TEXEIRA-SPENCER (J)# | CASE NO: 21-6099-STRAUSS |
| AUSA: (T. JONES DUTY AUSA) ✓ | ATTY: SIDNEY FLEISCHMAN |
| USPO: | VIOL: 21:U.S.C. § 846 |

PROCEEDING: INITIAL APPEARANCE ON A RULE 5 FROM COLUMBIA DISTRICT

RECOMMENDED BOND:

BOND/PTD HEARING HELD - yes / no

COUNSEL APPOINTED:

BOND SET @:

To be consigned by:

- ❏ All standard conditions
- ❏ Do not encumber property.
- ❏ Surrender and / or do not obtain passports / travel documents.
- ❏ Rpt to PTS as directed / or_ x's a week/month by phone; _ x's a week/month in person.
- ❏ Random urine testing by Pretrial Services. Treatment as deemed necessary.
- ❏ Maintain or seek full - time employment.
- ❏ No contact with victims / witnesses.
- ❏ No firearms.
- ❏ Electronic Monitoring:
- ❏ Travel extended to:
- ❏ Other:

A- APPEARING BY VIDEO CONF. CONSENTS TO APPEAR BY VIDEO. GOV'T MOVES TO UNSEAL INDICTMENT. ORDER SIGNED. ADVISED OF CHARGES SIDNEY FLEISCHMAN FILING TEMP APPEARANCE.

REQUEST PTD AND REMOVAL FOR WEDNESDAY.

{ INS DETAINER }

REPORT RE COUNSEL:

(PTD) BOND HEARING: WEDNESDAY MARCH 3rd AT 10 AM DUTY MAG.

ARRAIGN OR REMOVAL: WEDNESDAY MARCH 3rd AT 10 AM DUTY MAG

PRELIM/EXAM HRG

24
2/23/21   TIME: 11:00 AM   FTL/TAPE/# JMS-   { 15 MINS }   Begin   DAR:

[] *** RECORDED BY ZOOM 310 JUDGE HUNT'S COURTROOM**
***THE TIME FROM TODAY THROUGH THE RE-SCHEDULED DATE IS EXCLUDED FROM THE DEADLINE FOR TRIAL AS COMPUTED UNDER THE SPEEDY TRIAL ACT *** (YES OR NO) DAR: 12:51:11 - 13:01:33

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**20-mj-6099**

UNITED STATES OF AMERICA,
vs.
LUIS MIGUEL TEIXERA-SPENCER,
    Defendant.
_____/

## NOTICE OF TEMPORARY APPEARANCE

      COMES NOW, Jack A. Fleischman, Esq., of Fleischman & Fleischman, P.A., and files this temporary appearance as counsel of record for the above named defendant, for proceedings within the Southern District of Florida.

        /s/ Jack A. Fleischman_____
        FLEISCHMAN & FLEISCHMAN, P.A.
        Jack A. Fleischman
        2161 Palm Beach Lakes Blvd., Ste. 403
        West Palm Beach, FL 33409
        Phone  561-585-3666
        Fax    561-471-8343
        Fla. Bar No.: 0714534
        Email (CM/ECF): fflaws@gmail.com
        Email (personal):  jf@ffjustice.com

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Appearance was electronically filed with the Clerk of Court using CM/ECF and served this 24th day of February, 2021, on all counsel of record and the U.S. Attorney's Office, Ft. Lauderdale, Florida.

        /s/Jack A. Fleischman_____
        Jack A. Fleischman

cc: Client

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 21-mj-6099

UNITED STATES OF AMERICA,
vs.
LUIS MIGUEL TEIXERA-SPENCER,
    Defendant.
_____/

### NOTICE OF TEMPORARY APPEARANCE

      COMES NOW, Sidney Z. Fleischman, Esq., of Fleischman & Fleischman, P.A., and files this temporary appearance as counsel of record for the above named defendant, for proceedings within the Southern District of Florida.

/s/ Sidney Z. Fleischman
FLEISCHMAN & FLEISCHMAN, P.A.
Sidney Z. Fleischman
2161 Palm Beach Lakes Blvd., Ste. 403
West Palm Beach, FL 33409
Phone  561-585-3666
Fax    561-471-8343
Fla. Bar No.: 0714534
Email: sf@ffjustice.com

### CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Appearance was electronically filed with the Clerk of Court using CM/ECF and served this 2nd day of March, 2021, on all counsel of record and the U.S. Attorney's Office, Ft. Lauderdale, Florida.

/s/*Sidney Z. Fleischman*
Sidney Z. Fleischman

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**21-mj-6099**

UNITED STATES OF AMERICA,
vs.
LUIS MIGUEL TEIXERA-SPENCER,
   Defendant.
_____/

# <u>INDEX TO DEENDANT'S EXHIBITS 1 and 2</u>

   Description                                   Page(s)

<u>Exhibit 1</u>
Plea and sentencing paperwork
Defendant's Rhode Island case
showing case pleaded as a misdemeanor     1 – 2

<u>Exhibit 2</u>
Criminal Statute for Rhode Island case     2 - 3

/s/ <u>Jack A. Fleischman</u>
FLEISCHMAN & FLEISCHMAN, P.A.
Jack A. Fleischman
2161 Palm Beach Lakes Blvd., Ste. 403
West Palm Beach, FL 33409
Phone 561-585-3666
Fax 561-471-8343
Fla. Bar No.: 0714534
Email (CM/ECF): fflaws@gmail.com
Email (personal): jf@ffjustice.com

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Exhibits were electronically filed with the Clerk of Court using CM/ECF and served this 24th day of February, 2021, on all counsel of record and the U.S. Attorney's Office, Ft. Lauderdale, Florida.

/s/Jack A. Fleischman_____
Jack A. Fleischman

cc: Client

STATE OF RHODE ISLAND  AND PROVIDENCE PLANTATIONS

## SUPERIOR COURT

## REQUEST TO ENTER PLEA OF NOLO CONTENDERE OR GUILTY

| 1. STATE OF RHODE ISLAND | 2. CASE NO. |
|---|---|
| VS. _Luis Teixeira Spencer_ | _P2-2017-1125A_ |

| 3. CHARGES | 4. PENALTY |
|---|---|
| Ct. 1 - Obtaining money under false Pretenses over $1500 | Ct. 1 - 5 yrs ACI |
| Ct. 2 - forgery | Ct. 2 - 1 yr ACI |

I, the above named defendant/do hereby request Court permission to withdraw my present plea of Not Guilty and to enter a plea of
**Nolo Contendere or Guilty.** I understand the plea of *Nolo Contendere* is for all purposes the same as a plea of Guilty and that I will be
admitting sufficient facts to substantiate the charge(s) which has (have) been brought against me in the case to which this plea relates. I understand by
changing my plea I will be giving up and waiving each and all of my rights as follows:

1. My right to a trial by jury or by a Judge, sitting without a jury, and my right to appeal to the Supreme Court from any verdict or finding of guilt.
2. My right to have the State prove each and every element of the charge(s) against me by evidence and proof beyond a reasonable doubt.
3. My right to the presumption of innocence.
4. My privilege against self-incrimination.
5. My right to confront and cross-examine the State's witnesses against me.
6. My right to present evidence and witnesses on my own behalf and to testify in my own defense if I choose to do so.
7. My right to appeal to the Rhode Island Supreme Court from the sentence imposed by the Court after the entry of my plea of **Nolo Contendere or Guilty.**
8. My right to have the Court obtain and consider a pre-sentence report before the imposition of sentence by the Court.
9. My right to file a motion for a reduction in sentence.

No promises have been made by my Attorney, the State's Attorney, or the Court, other than the fact that the Court has agreed to impose the
following sentence in addition to whatever money costs are imposed by law.

| 5. SENTENCE |
|---|
| Amended Ct 1 - Obtaining money under false pretenses under $1500 1 yr. Filing restitution 3000 to be Ct 2 - 48A waive costs pd today |

I understand if the Court imposes the sentence referred to above, I will not be permitted to withdraw my plea of Nolo Contendere or Guilty
except by permission of the Court.
*I also understand that this conviction will result in the loss of my right to vote only if I am incarcerated and/or for as long as I an incarcerated, and
that my voting rights will be restored upon my release.*
**I UNDERSTAND THAT IF I AM A RESIDENT ALIEN, A SENTENCE IMPOSED AS A RESULT OF MY PLEA MAY RESULT IN
DEPORTATION, EXCLUSION OF ADMISSION TO THE UNITED STATES, AND/OR DENIAL OF NATURALIZATION PURSUANT
TO THE LAWS OF THE UNITED STATES, AND THAT THIS COURT WILL HAVE NO CONTROL OVER THOSE PROCEEDINGS.**
I have discussed the entire contents of this form with my Attorney, who has explained it to me. I have no questions as to what it states or
what it means, and I understand it completely. I swear to the truth of the above.

| 6. WITNESS (Attorney for the Defendant) Date _10/6/17_ | 7. DEFENDANT Date _10-06-17_ |
|---|---|
| Signature _Anton Colella_ | Signature _[signed]_ |
| Print Name _Anton Colella_ Reg# _5902_ | Print Name _Luis Spencer_ |

J-1 (REV. 02-07)                    (CERTIFICATE OF JUDGE ON REVERSE SIDE)

SUPERIOR COURT
FILED
RICHARD S. KINCH, JR.
17 OCT -6 PM 12: 34

23

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## SUPERIOR COURT

## CERTIFICATE OF JUDGE

| 1. STATE OF RHODE ISLAND<br>    VS. | 2. CASE NO. |
|---|---|
| | |

This certifies that the defendant has come before me, in the presence of counsel, and presented the attached request, affidavit and attorney's certification. Thereupon, I addressed the defendant personally in open court, and established by responses to my questions that the defendant has been fully informed of the contents of the affidavit, all of the rights enumerated therein, and the nature and consequences of this plea as set forth therein. The defendant has also been made aware of the range of punishment which might be imposed, as well as any assurances made to the defendant by counsel, the prosecuting attorney or the court regarding a sentence. The Court finds the defendant has the capacity to understand all of the above.

I have also been satisfied by the prosecutor's statement of the facts, the defendant's answers, and the content of the affidavit that there is a factual basis for the plea. I find this plea is made voluntarily, intelligently, and with knowledge and understanding of all matters set forth in the attached request and affidavit.

| 3. JUSTICE | |
|---|---|
| Signature | Date 10 6 7 |

J-1 (REV. 02-07)    (REQUEST TO ENTER PLEA OF NOLO CONTENDER OR GUILTY ON REVERSE SIDE)

24

# 2013 Rhode Island General Laws
# Title 11 - Criminal Offenses
# Chapter 11-41 - Theft, Embezzlement, False Pretenses, and Misappropriation
# Section 11-41-5 - Penalties for larceny.

**Universal Citation:** RI Gen L § 11-41-5 (2013)

**§ 11-41-5 Penalties for larceny.** – (a) Any person convicted of any offense under §§ 11-41-1 – 11-41-6, except § 11-41-3, if the value of the property or money stolen, received, embezzled, fraudulently appropriated, converted, or obtained, received, taken, or secreted by false pretenses or otherwise with intent to cheat, defraud, embezzle, or fraudulently convert exceeds one thousand five hundred dollars ($1,500), or if the property is a firearm as defined in § 11-47-5.1, regardless of its value, shall be punished by imprisonment for not more than ten (10) years or by a fine of not more than five thousand dollars ($5,000), or both. If the value of the property or money does not exceed one thousand five hundred dollars ($1,500), the person shall be punished by imprisonment for not more than one year, or by a fine of not more than five hundred dollars ($500), or both. Any person convicted of an offense under § 11-41-2 who shall be found to have knowingly obtained the property from a person under eighteen (18) years of age, notwithstanding the value of the property, shall be punished by imprisonment for not more than ten (10) years or by a fine of not more than five thousand dollars ($5,000), or both.

(b) Any person convicted of an offense in violation of §§ 11-41-1 – 11-41-7, except § 11-41-3, which involves a victim who is a person sixty-five (65) years of age or older at the time of the offense and which involves property or money stolen, received, embezzled, fraudulently

appropriated, converted, or obtained, received, taken, or secreted by false pretenses or otherwise with intent to cheat, defraud, embezzle, or fraudulently convert, with a value in excess of five hundred dollars ($500), shall be punished by imprisonment for not less than two (2) years but not more than fifteen (15) years or by a fine of not more than five thousand dollars ($5,000), or both. If the value of the property or money does not exceed five hundred dollars ($500), the person shall be punished by imprisonment for not less than one year but not more than five (5) years or by a fine of not more than three thousand dollars ($3,000), or both.

History of Section.
(G.L. 1896, ch. 279, § 11; G.L., ch. 279, § 16; C.P.A. 1905, § 1175; P.L. 1908, ch. 1521, § 1; G.L. 1909, ch. 345, § 16; G.L., ch. 345, § 18; P.L. 1915, ch. 1258, § 10; G.L. 1923, ch. 397, § 18; G.L. 1938, ch. 608, § 18; G.L. 1956, § 11-41-5; P.L. 1979, ch. 224, § 1; P.L. 1980, ch. 318, § 1; P.L. 1984, ch. 278, § 1; P.L. 1985, ch. 287, § 1; P.L. 1987, ch. 90, § 1; P.L. 1988, ch. 271, § 1; P.L. 1991, ch. 38, § 1; P.L. 1993, ch. 324, § 1; P.L. 2012, ch. 137, § 1; P.L. 2012, ch. 176, § 1.)

**Disclaimer:** These codes may not be the most recent version. Rhode Island may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

UNITED STATES DISTRICT COURT FOR SOUTHERN DISTRICT OF FLORIDA **COURT ORDER/MINUTES**

U.S. MAGISTRATE JUDGE JARED M. STRAUSS- FORT LAUDERDALE, FLORIDA (VIA ZOOM)

DEFT: LUIS TEIXEIRA-SPENCER (J)#31362-509      CASE NO: 21-6099-STRAUSS

AUSA: TREVOR JONES/L. CRANE/R. FLETCHER      ATTY: JACK FLEISCHMAN

USPO:      VIOL: 21:U.S.C. § 846

PROCEEDING: PRETRIAL DETENTION      RECOMMENDED BOND:

BOND/PTD HEARING HELD - yes / no      COUNSEL APPOINTED:

BOND SET @: **$150,000 PSB & $100,000 10% NEBBIA**      To be consigned by: **DEFENDANT'S COUSIN AND AUNT**

| | | |
|---|---|---|
| ❑ | All standard conditions | **DEFENDANT APPEARING BY VIDEO CONFERENCE** |
| ✓ | Do not encumber property. | **CONSENTS TO APPEAR BY VIDEO. DEFENDANT DOES NOT** |
| ✓ | Surrender and / or do not obtain passports / travel documents. | **CONTEST REMOVAL. WAIVED REMOVAL.** |
| ✓ | Rpt to PTS as directed or _ x's a week/month by phone; _ x's a week/month in person. | **GOVERNMENT PROCEED BY PROFFER. SWORN/TEST** |
| ✓ | Random urine testing by Pretrial Services. _____ Treatment as deemed necessary. | **FBI AGENT SEAN HAMBLET. CROSS-EXAMINED BY** |
| ❑ | Maintain or seek full - time employment. | **DEFENSE COUNSEL. COURT DENIES GOVERNMENT'S** |
| ✓ | No contact with victims / witnesses. | **REQUEST FOR DETENTION. SETS BONDS OF $150,000 PSB** |
| ✓ | No firearms. | **& $100,000 10% CASH WITH NEBBIA** |
| ✓ | Electronic Monitoring: | **GOVERNMENT REQUEST A STAY FOR THREE DAYS** |
| ✓ | Travel extended to: RHODE ISLAND DISTRICT OF COLUMBIA. | **COURT GRANTS REQUEST, STAYED PENDING APPEAL** |
| ✓ | Other: PLEASE REFER TO BOND FOR SPEC CONDITIONS. | ** DUE PROCESS PROTECTION ACT ORDER ISSUED (BRADY) ** * (INS DETAINER LODGED )* |

| NEXT COURT APPEARANCE: | DATE: | TIME: | JUDGE: | PLACE: |
|---|---|---|---|---|

REPORT RE COUNSEL:

**PTD**/BOND HEARING:

<u>ARRAIGN</u> OR REMOVAL:

**PRELIM/EXAM HRG**

| 3/31/21 | TIME: | **10:00 AM** | FTL/TAPE/# JMS- | Begin | **DAR:** |
|---|---|---|---|---|---|

[1 HOUR AND 50 MINUTES] *** RECORDED BY ZOOM 310 JUDGE HUNT'S COURTROOM**
***THE TIME FROM TODAY THROUGH THE RE-SCHEDULED DATE IS EXCLUDED FROM THE DEADLINE FOR TRIAL AS COMPUTED UNDER THE SPEEDY TRIAL ACT *** (YES OR NO) DAR: 10:41:11-12:49:25

27

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
            Case No. 21-6099-MJ-JMS and 21-6100-MJ-JMS
 3
    UNITED STATES OF AMERICA,    )
 4                               )
         GOVERNMENT,             )
 5                               )
         -v-                     )
 6                               )
    LUIS MIGUEL TEIXEIRA-SPENCER,)
 7   AND OLATUNJI DAWODU,        )
                                 )
 8        DEFENDANTS.            )    Fort Lauderdale, Florida
                                 )    March 31, 2021
 9   _____)


10


11        TRANSCRIPT OF VIDEO DETENTION AND REMOVAL HEARING

12            BEFORE THE HONORABLE JARED M. STRAUSS

13                UNITED STATES MAGISTRATE JUDGE

14
    Appearances:
15
    FOR THE GOVERNMENT          Trevor C. Jones, ESQ., AUSA
16                              U.S. Attorney's Office
                                500 East Broward Boulevard
17                              Suite 7th Floor
                                Fort Lauderdale, FL 33394
18   -and-
                                Laura Crane, ESQ., AUSA, and
19                              Rachel Fletcher, ESQ., AUSA
                                555 4th Street Northwest
20                              Washington, DC 20530

21   (Continued on Page 2.)

22   Reporter                   Stephen W. Franklin, RMR, CRR, CPE
     (561)313-8439              Official Court Reporter
23                              500 West Capitol Avenue
                                Little Rock, AR 72201
24                              E-mail:  SFranklinUSDC@aol.com

25        Proceedings recorded by DIGITAL AUDIO RECORDING, and
     transcript prepared utilizing computer-aided transcription.
```

(Continued on Page 2.)

```
 1    Appearances (Cont.'d)

 2    FOR DEFENDANT SPENCER        Jack A. Fleischman, ESQ.
                                  Fleischman & Fleischman, P.A.
 3                                2161 Palm Beach Lakes Blvd
                                  Suite 403
 4                                West Palm Beach, FL 33409

 5    FOR DEFENDANT DAWODU        Landon W. Ray, ESQ.
                                  Chukwuma, Hildebrandt & Ray, PLLC
 6                                1135 Kane Concourse
                                  5th Floor
 7                                Bay Harbor Islands, FL 33154

 8                                *  *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            (Call to the order of the Court.)

 2            THE COURT:  Okay.  May I please have appearances

 3    from all the parties starting with the government.

 4            MR. JONES:  Good morning, Your Honor.  Assistant

 5    United States Attorney Trevor Jones on behalf of the

 6    government.

 7            THE COURT:  Good morning, Mr. Jones.

 8            Who do we have here --

 9            Mr. Jones, is anyone appearing from the District of

10    Columbia for the government, as well?

11            MR. JONES:  Yes, Your Honor.  We have AUSA Laura

12    Crane and Rachel Fletcher, who are the attorneys on the -- on

13    the indictments.

14            THE COURT:  Good morning, Ms. Crane.

15            MS. CRANE:  Good morning.

16            THE COURT:  And Ms. Fletcher I don't see you, but

17    good morning to you.

18            Who do we have appearing on behalf of

19    Mr. Teixeira-Spencer?

20            MR. FLEISCHMAN:  Good morning, Your Honor.  Jack

21    Fleischman for Spencer; he's if custody.

22            THE COURT:  Good morning, Mr. Fleischman.

23            Mr. Fleischman, I'm having a hard time hearing you.

24            MR. FLEISCHMAN:  Let me take out my -- can you hear

25    me better?
```

```
 1              THE COURT:  Yes, that's much better.  Thank you,
 2   Mr. Fleischman.
 3              Mr. Teixeira is appearing from the cellblock?
 4              MR. FLEISCHMAN:  He is, Your Honor.
 5              THE COURT:  Mr. Teixeira, can you see and hear me
 6   okay?
 7              THE DEFENDANT:  Yes, Your Honor.
 8              THE COURT:  Okay.  Who do we have on behalf of
 9   Mr. Dawodu?
10              MR. FLEISCHMAN:  Judge, I'm sorry, I need to
11   interrupt (inaudible) Teixeira.  I don't see my client.  I
12   want to make sure he was on.
13              THE COURT:  Hold on a second.
14              So Mr. Wacia (phonetic) Teixeira, I assume you're
15   a -- you're related to the defendant?
16              UNIDENTIFIED SPEAKER:  Yes, Your Honor.
17              THE COURT:  Okay.  If you're going to -- if I could
18   ask you to please turn off your camera and your microphone
19   unless and until you're asked to testify.  We're trying to
20   minimize the number of people that are appearing on the
21   screen.
22              Mr. Luis Teixeira-Spencer, you're appearing from the
23   cellblock, correct?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Mr. Fleischman, can you see him from the
```

```
 1  cellblock there?

 2          MR. FLEISCHMAN:  I do.  I see him now, thank you.

 3          THE COURT:  Okay.  Who do we have on behalf of

 4  Mr. Dawodu?

 5          MR. RAY:  Good morning, Your Honor.  Can you hear

 6  me?

 7          THE COURT:  Yes.

 8          MR. RAY:  This is Landon Ray on behalf of

 9  Mr. Olatunji Dawodu.  And I am in the courtroom, and

10  Mr. Dawodu is present here in the courtroom with me.

11          THE COURT:  Mr. Dawodu is there in the courtroom?

12          MR. RAY:  Yes, Your Honor.

13          THE COURT:  Okay.  We are here for a detention

14  hearing as to Mr. Dawodu and a detention and removal hearing

15  as to Mr. Teixeira-Spencer.  First let me -- let me confirm

16  with counsel for each of the defendants with respect to your

17  clients' right to have these hearings in person, and are they

18  consenting to do it by video conference?

19          First Mr. Fleischman on behalf of Mr. Teixeira-

20  Spencer.

21          MR. FLEISCHMAN:  Yes, Your Honor, he consents.

22          THE COURT:  Thank you.

23          And Mr. Ray on behalf of Mr. Dawodu?

24          MR. RAY:  Yes, he consents, Your Honor.

25          THE COURT:  Let me also just confirm,
```

```
 1   Mr. Fleischman, are we still going ahead with the removal

 2   hearing today?

 3             MR. FLEISCHMAN:  We are not contesting removal, we

 4   just want to go ahead with the detention hearing.

 5             THE COURT:  Okay.  I'll address (inaudible) towards

 6   the end, then.

 7             MR. FLEISCHMAN:  Thank you.

 8             THE COURT:  Are we prepared to proceed regarding the

 9   pretrial detention?

10             MR. FLEISCHMAN:  Yes, Your Honor.

11             MR. JONES:  Yes, Your Honor.

12             THE COURT:  One moment, please.

13             Okay.  Mr. Jones, are you going to be presenting for

14   the government, or is one of the AUSAs from D.C. going to be

15   leading your presentation?

16             MR. JONES:  I will be presenting, Your Honor.

17             THE COURT:  Okay.  Please tell me what the basis for

18   detention is for each defendant.

19             MR. JONES:  We're proceeding under 3142(f)(1)(C).

20   The defendants are a danger to the community and a risk of

21   flight.  We believe there should be a presumption in this case

22   after the presentation and the factual proffer.

23             THE COURT:  Okay.  What is the maximum penalty that

24   each of the defendants faces?

25             MR. JONES:  They're placing life imprisonment with a
```

```
1   10-year minimum mandatory.

2              THE COURT:  Okay.  And what is the estimated

3   guideline range?

4              MR. JONES:  Guidelines are estimated roughly 121 to

5   151 months.

6              THE COURT:  And is the government going to proceed

7   by proffer this morning?

8              MR. JONES:  Yes, Your Honor.  And we have agent Sean

9   Hamblet from the FBI with us today.

10             THE COURT:  Okay.  Please proceed with your proffer,

11  Mr. Jones.

12             MR. JONES:  Thank you, Your Honor.

13             The FBI, in partnership with other law enforcement

14  agencies, have investigated a dark net market vendor that

15  operates the moniker, quote, John Carter 7; that's a

16  numeral 7.  Beginning in approximately February of 2017 and

17  continuing through May of 2020, John Carter 7 sold pills

18  pressed with Fentanyl on a number of dark net markets,

19  including AlphaBay, Wall Street, Dream and Empire.  As one

20  dark net market would get shut down, the vendor would migrate

21  to new markets.  The vendor listed the pills as Oxycodone M30,

22  best in the market, but also included descriptions on its site

23  that noted that the pills contained Fentanyl and claimed that

24  the pills are pre -- quote, the pills are pressed with just

25  the right amount of Fentanyl, no hotspots, end quote.
```

1    No hotspots is an attempt to convey to customers
2    that the pills would pose less of a risk of overdose.  In
3    context, according to the DEA's 2019 National Drug Threat
4    Assessment, Fentanyl remains the primary driver behind the
5    ongoing opioid crisis and continues to be the most lethal
6    category of illicit substances that's used in the United
7    States.  A potential lethal dose of Fentanyl is any dose
8    greater than 2 milligrams; that is 2-1000ths or 1-500th of a
9    gram.

10    The mean consistent amount of Fentanyl present in
11    Fentanyl-containing pills is another major contributor to the
12    pills' lethality.  In 2018, DEA's Fentanyl Signature Profiling
13    Program examined 148 tablet exhibits representing 180
14    kilograms in which the average tablet contained 1.5 milligrams
15    of Fentanyl, with a range of .02 to 4.84 milligrams per
16    tablet.  (Inaudible) 19 tablets, about 13 percent that
17    contained a lethal dose of Fentanyl; that is, a dose greater
18    than 2 milligrams.

19    Back to the instant investigation, records from the
20    dark net markets and from servers seized when certain markets
21    were shut down by law enforcement indicate the following
22    volume of pill sales by John Carter 7:  More than 40,000 pills
23    were sold on AlphaBay, approximately 8000 pills on Dream,
24    approximately 1700 pills on Wall Street, and more than 18,000
25    on Empire.

```
 1              John Carter 7 also began communicating --

 2              THE COURT:  Hold on, Mr. Jones.  Hold on.  You said

 3    1700 on~--

 4              MR. JONES:  Wall Street.

 5              THE COURT:  -- on Wall Street and 18,000 on~--

 6              MR. JONES:  Empire.

 7              May I continue?

 8              THE COURT:  Yes, please.

 9              MR. JONES:  John Carter 7 also began communicating

10    with customers directly without using the dark net markets

11    through an encrypted messaging application called Jabber.  In

12    those transactions, John Carter 7 would provide a Bitcoin

13    address for the customer to provide payment and would then

14    send the requested pills to the customer directly.

15              During the course of the investigation, law

16    enforcement identified that Dream, Wall Street and Empire all

17    had the same PGP public key, and embedded within each key was

18    the same e-mail address.  Law enforcement obtained records

19    related to that e-mail address that linked to the defendant,

20    Luis Spencer.  Physically, the e-mail address was the recovery

21    address for an account on LocalBitcoins.com, the

22    cryptocurrency exchange.  The LocalBitcoins.com account name

23    was, quote, John Carter 777, all one word, and those are

24    numerals.

25              Law enforcement contacted a Bitcoin trader who made
```

numerous transactions with John Carter 777, and that Bitcoin

trader identified Spencer's photograph as the individual with

whom he had traded under the moniker John Carter 777.  The

trader could identify Spencer because he met him on multiple

occasions but only knew him by a nickname.

The same Bitcoin trader also traded with Spencer

under another moniker, quote, LBC John Carter 777, all one

word and using numerals, and records for that moniker include

Spencer's name, as well as phone number and e-mail used by

Spencer.  The Bitcoin trader's phone had a saved contact in

the Telegram application with the name LBC John Carter 777

that the Bitcoin trader said was the same individual he

(inaudible) identified as using the moniker John Carter 777;

that is, defendant Spencer.

Additionally, law enforcement traced funds from John

Carter 7 to Spencer.  Specifically, records from Coinbase

revealed proceeds from John Carter 7 were used to process a

payment to Expedia to reserve a hotel room in Fort Lauderdale

from May 27th to May 29th, in 2017.  Records from Expedia

indicate that the reservation was paid for in Bitcoin, was

made in Spencer's name, and include Spencer's phone number and

e-mail address.

Additionally, in June and December 2019, an

undercover officer conducted direct buys of Fentanyl-pressed

pills from John Carter 7 using Jabber.  The undercover made

payments to Bitcoin addresses provided by John Carter 7, and law enforcement was able to trace those payments from the undercover to an account at Finance connected to defendant Spencer, which account was accessed numerous times from an IP address in Spencer's name and from Spencer's residence.

One of Spencer's close contacts is defendant Olatunji Dawodu.  During the course of the investigation, law enforcement observed the two men meet on numerous occasions. Law enforcement installed a pole camera that captured Dawodu and Spencer coming and going from a storage unit in Davie, Florida, where they were frequently seen bringing in and taking out boxes.

During surveillance of Dawodu, law enforcement observed Dawodu drop packages on separate occasions. Specifically, on June -- July 17th, 2019, law enforcement observed Dawodu drop packages at a blue USPS mailbox.  Law enforcement contacted two of the intended recipients of those packages that contained pills which were consistent with the pills purchased by the undercover from John Carter 7.  In interviews with the intended recipients and reviewing their accounts, law enforcement confirmed that the two seized packages had been ordered from John Carter 7 on Empire Market.

Similarly, in August of 2019, law enforcement again observed Dawodu drop packages.  They observe -- law enforcement followed up with the intended recipients of one of

those packages, and an individual provided consent to open the package, which again contained pills packaged similarly to the pressed Fentanyl pills seized throughout the investigation.

In addition to the pills connected to John Carter 7, a confidential human source also purchased pills from Dawodu on multiple occasions, including in May of 2020, October of 2020, January 7th, 2021, and January 25th, 2021. The pressed pills purchased by the confidential source were consistent with the pills that were packaged in packages dropped by Dawodu that had been purchased on John Carter 7.

On February 23rd, 2021, law enforcement executed search warrants at both of the defendants' residences. In Dawodu's residence, law enforcement found approximately 1400 grams of pills consistent with pills ordered from John Carter 7, numerous electronic devices and approximately 30 USPS mailing envelopes consistent with those used by John Carter 7. Law enforcement also recovered a handgun in a drawer in the residence. At defendant Spencer's residence, law enforcement found $12,000 in cash and numerous electronic devices.

That same day, law enforcement executed a search warrant at a residence of an associate of Dawodu and Spencer in Providence, Rhode Island, Alex Ogando. Inside that residence, law enforcement recovered approximately $370,000 in cash, more than 1770 grams of light blue pills that field

```
1    tested positive for the presence of Fentanyl, and
2    approximately 30 USPS Priority Mail envelopes containing
3    363 grams of pills packed for mailing.
4            Dawodu has also been indicted in the District of
5    Columbia on another conspiracy to distribute over 400 grams of
6    Fentanyl for a similar distribution scheme with Mr. Ogando.
7            THE COURT:  Hold on a second, Mr. Jones.  My
8    computer crashed and I was out of the meeting there for a
9    little while.  So the last I heard was regarding the local
10   Bitcoin -- you were discussing the tie between the Expedia
11   purchase and the John Carter -- the John Carter Bitcoin
12   account.
13           MR. JONES:  Okay.  I'll apologize for everyone else
14   for having to hear my voice for that long again, but I'll go
15   back.
16           Okay.  Back to the Expedia.  Records from Expedia
17   indicated the reservation in Fort Lauderdale was paid for in
18   Bitcoin, was made in Spencer's name and included Spencer's
19   phone number and e-mail address.
20           Additionally, in June and December 2019, an
21   undercover officer conducted direct buys of Fentanyl-pressed
22   pills from John Carter 7 using Jabber.  The undercover made
23   payments to Bitcoin addresses provided by John Carter 7.  Law
24   enforcement was able to trace those payments through the
25   undercover to an account at Finance connected to Spencer,
```

```
 1   which account was accessed numerous times from an IP address
 2   in Spencer's name and from Spencer's residence.
 3          One of Spencer's close contacts is defendant
 4   Olatunji Dawodu.  During the course of the investigation, law
 5   enforcement observed two men -- the two men meet on numerous
 6   occasions.  Law enforcement installed a pole camera that
 7   captured Dawodu and Spencer coming and going from a storage
 8   unit in Davie, Florida, where they were frequently seen
 9   bringing in and taking out boxes.
10          During surveillance of Dawodu, law enforcement
11   observed Dawodu drop packages on two separate occasions.
12   Specifically, on July 17th, 2019, law enforcement observed
13   Dawodu drop packages at a blue USPS mailbox.  Law enforcement
14   contacted two of the intended recipients, and both packages
15   contained pills that were consistent with pills purchased by
16   the undercover from John Carter 7.  In interviewing the
17   intended recipients and reviewing their accounts, law
18   enforcement confirmed that the two seized packages had been
19   ordered from John Carter 7 on Empire Market.
20          Similarly, in August of 2019, law enforcement again
21   observed Dawodu drop packages.  Law enforcement observed --
22   followed up with the intended recipients of one of the
23   packages, and that individual provided consent to open the
24   package, which also contained pills packaged similarly to the
25   pressed Fentanyl pills seized throughout this investigation.
```

```
 1              In addition to the pills connected to John Carter 7,
 2  a confidential human source also purchased pills from Dawodu
 3  on multiple occasions, including in May of 2020, October of
 4  2020, January 7th, 2021, and January 25th, 2021.
 5              THE COURT:  Mr. Jones, did you say were those --
 6  those were in-person purchases from --
 7              MR. JONES:  Yes.
 8              THE COURT:  -- Dawodu?
 9              MR. JONES:  Yes, by a confidential human source.
10              THE COURT:  Okay.
11              MR. JONES:  The pressed pills were purchased by the
12  confidential source and were consistent with the pills that
13  were packages dropped by Dawodu that had been purchased on
14  John Carter 7.
15              On February 23rd, 2021, law enforcement executed
16  search warrants at both defendants' residences.  At Dawodu's
17  residence, law enforcement found and seized approximately
18  1400 grams of pills consistent with the pills ordered through
19  John Carter 7, numerous electronic devices, and approximately
20  30 USPS mailing envelopes consistent with those used by John
21  Carter 7.  Law enforcement also recovered a handgun at the
22  residence.  At Spencer's residence law enforcement found
23  $12,000 in cash, as well as additional electronic devices.
24              The same day, law enforcement executed a search
25  warrant at a residence of an associate of Dawodu and Spencer
```

in Providence, Rhode Island, Alex Ogando. Inside of that
residence law enforcement recovered approximately $370,000 in
cash and more than 1770 grams of light blue pills that field
tested positive for the presence of Fentanyl, and
approximately 30 USPS Priority Mail envelopes containing
363 grams of pills packed for mailing.

Dawodu has also been indicted in the District of
Columbia on another conspiracy to distribute over 400 grams of
Fentanyl for a similar distribution scheme with Mr. Ogando.

Following his arrest and while in jail, Spencer
called his girlfriend, Ms. Schilling, from jail, and the two
were recorded, the following exchange.

Mr. Spencer stated: "I had a backpack on the floor
with garage and shit. They took that?"

Ms. Schilling: "Your black backpack? No, they took
your cameras.

"Mr. Spencer: I mean my black backpack, the other
one, the NPN.

"Ms. Schilling: It's right here. There's laptops
here.

"Mr. Spencer: Get rid of it."

This concludes the factual proffer. FBI agent Sean
Hamblet's available for cross-examination.

THE COURT: Special agent Spencer (sic), can you
turn on your -- can you turn on your video, please? Actually,

```
 1   if you'll just hold on a second.
 2           Everyone who's joining us now for the 11:00 o'clock
 3   calendar, we are still in the middle of a detention hearing
 4   from prior to that calendar.  If you'd all make sure that your
 5   video and microphone is off if you're not participating in the
 6   10:00 o'clock hearing.  We will proceed with the 11:00 o'clock
 7   calendar as soon as we're done with this hearing.
 8           Special agent Hamblet, can you please turn on your
 9   microphone.
10           Special agent Hamblet, please raise your right hand.
11           Sean Hamblet, Government's witness, sworn.
12           THE COURT:  You can put your hand down.
13           Did you hear the factual proffer read by AUSA Jones?
14           THE WITNESS:  I did.
15           THE COURT:  Okay.  And do you have any corrections
16   to that proffer?
17           THE WITNESS:  Your Honor, there was a question I
18   believe about whether or not the deals that were executed with
19   the confidential human source were conducted in person, and
20   I'd like to clarify something on that if I may.
21           THE COURT:  Please do.
22           THE WITNESS:  Your Honor, may I refer to any notes?
23           THE COURT:  Yes, go ahead.
24           While he's doing that, again, if any of the
25   attorneys or parties or witnesses who are here for the
```

```
 1   11:00 o'clock hearing who are not participating in the
 2   10:00 o'clock hearing, please turn off your videos and
 3   microphones so that we can have as clear a stream as possible
 4   for this 10:00 o'clock hearing.  Thank you.
 5              THE WITNESS:  Your Honor, the only clarifying point
 6   I'd like to make is that the communications with -- between
 7   Mr. Dawodu and the CHS, some of those communications happened
 8   electronically and resulted in in-person -- in in-person
 9   meetings.
10              That's the only clarifying point that I'd like to
11   make, Your Honor.
12              THE COURT:  Thank you very much, special agent.
13   Other than that correction, do you adopt the factual proffer
14   as your direct testimony?
15              THE WITNESS:  I do.
16              THE COURT:  Okay.  Can you -- Mr. Fleischman on
17   behalf of Mr. Spencer, why don't you start with
18   cross-examination, please.  Yes, thank you, Your Honor.
19                        Cross-Examination
20   BY MR. FLEISCHMAN:
21   Q    And special agent Hamblet, you'll let me know if you
22   cannot hear me, and I'll repeat the question.
23   A    Will do.
24   Q    Can you hear me okay, or . . .
25   A    I can.
```

```
 1    Q    Okay.  Thank you.  I'll begin.

 2              I want to ask you first about the search of homes

 3    and other places that took place here.  It's correct that no

 4    drugs were found in Mr. Spencer's home; is that correct?

 5    A    That's correct.

 6    Q    And is it correct that no firearms were found in

 7    Mr. Spencer's home?

 8    A    It is correct.

 9    Q    And is it correct that Mr. Spencer, I'm assuming, was

10    surveilled during the course of this (inaudible).

11    A    I'm sorry, sir, you broke up on me.

12    Q    Sure.  Was Mr. Spencer part of your surveillance during

13    the course of the investigation prior to his arrest?

14    A    Mr. Spencer was the subject of physical surveillance.

15    Q    And at any time was he seen possessing or moving any form

16    of weapon?

17    A    Did you say moving any form of weapon, sir?

18    Q    Yes; or possessing a weapon.

19    A    No.

20    Q    And was Mr. Spencer ever seen holding, physically

21    holding, what you believed to be any form of drugs?

22    A    He was seen holding envelopes we believe contained drugs,

23    but not actual -- I didn't see actual drugs in his hand.

24    Q    Okay.  And the envelopes that he was seen holding were

25    never seized; is that correct?
```

```
1    A    I believe that's correct, yes.

2    Q    Okay.  You could not say that anything illegal is

3    contained within those envelopes; is that correct?

4    A    That's correct.

5    Q    Now, the co-defendant, Mr. Dawodu, you used the term the

6    packages were dropped.  I'm assuming you mean that they were

7    mailed at a postal center?

8    A    I'm sorry, sir.  You broke up on me a little bit there.

9    Q    I'll move the mic a little.

10        The -- now, you had testified that Mr. Dawodu -- it

11   was part of the proffer -- Dawodu was seen dropping packages.

12   Does that refer to dropping packages at a postal center?

13   A    Or USPS mailbox.

14   Q    Okay.  At no time was Mr. Spencer with him (inaudible)?

15   A    I'm sorry, I'm hearing either background noise or I've

16   had a hard time hearing you.  Can you please repeat?

17   Q    Yes.  At no time was Mr. Spencer seen with Mr. Dawodu

18   when he was at a postal center or United States Post Office;

19   is that correct?

20   A    Not that I'm aware of, sir.

21   Q    And the packages that were intercepted, those came from,

22   you believe, Mr. Dawodu; is that correct?

23   A    The packages that we intercepted and later determined to

24   contain pills?

25   Q    Yes; you believe those were dropped by Dawodu?
```

1    A    That's correct.

2    Q    Is it correct that there's no physical evidence in this

3    case that links Mr. Spencer to any of the drugs that were

4    actually collected and placed into evidence in this case; is

5    that correct?

6    A    Meaning physical evidence that we collected during the

7    course of the search warrant and --

8    Q    Yes.  There's no physical evidence that links him to any

9    of the drugs that you physically collected, whether it be

10   search warrant or packages that were -- were intercepted; is

11   that correct?

12   A    Correct.

13   Q    Okay.  And none of the -- none of the -- I'm using the

14   term "suspects," but none of the purchasers of these drugs

15   that you interviewed have identified Spencer as the person

16   that they purchased drugs from; is that correct?

17   A    Not directly, that's correct.

18   Q    Okay.  And the confidential informant, the human source

19   that was used to target and make contact with Mr. Dawodu, that

20   informant had no contact with Mr. Spencer; is that correct?

21   A    Not that I'm aware of, sir.

22   Q    And was the confidential informant being paid, or working

23   off a charge when he was working this case?

24   A    I don't know the answer to that, sir.

25   Q    Was it a confidential informant that was used by the FBI

```
 1   or a local agency?
 2   A    I can say that it was used by the FBI.  The extent of
 3   that person's work with other agencies I'm not aware of.
 4   Q    Okay.  Did you vet the CI to have some confidence that
 5   the CI was reliable?
 6   A    I didn't -- so this confidential human source was not my
 7   human source, so I'm not sure of the extent of the vetting
 8   that was done on this source.
 9   Q    Do you know if the human source ever brought up the name
10   of Mr. Spencer?
11   A    I don't believe so, but I'm not sure.
12   Q    Okay.  As of today, have you recovered any narcotics that
13   came from Mr. Spencer directly?  And let me correct that; that
14   you can say came from Mr. Spencer directly.  Have you
15   recovered any physical narcotics that you can say came from or
16   were delivered by Mr. Spencer directly?
17   A    Not that we can say with certainty.
18   Q    Was a search warrant executed or maybe a consensual
19   search done on the storage unit that you -- was referred in
20   the proffer?
21   A    Not that I'm aware of.
22   Q    And I'm correct that there was nothing in Mr. Dawodu's
23   home that connected Spencer to Mr. Dawodu, is that correct,
24   that you located during the search?
25   A    The review of electronics that we've collected at the
```

1   home is ongoing, so nothing that I'm aware of right now that

2   directly connects the two.  But as I said, the search of

3   electronics is ongoing.

4   Q    Okay.  Now, Mr. Spencer's home was searched; is that

5   correct?

6   A    Yes.

7   Q    Okay.  And there was reference made in the proffer to a

8   phonecall while he was in custody to his girlfriend, where he

9   speaks of, quote, getting rid of or removing sounds like maybe

10  computers or some form of electronics.

11        Were you present for the search of the home?  Let me

12  ask you that first.

13  A    I was not, not the search of -- when the search warrants

14  were executed, I was at Mr. Dawodu's home.

15  Q    And am I correct that what Mr. Spencer was referencing on

16  the phone was actually left at the house by the agents after

17  the search?

18  A    I can make that assumption.  All I know is from the call

19  it sounded like there was a bag found by Ms. Schilling that

20  contained electronics.  So I don't know what was left behind

21  by the agents, but I can make that assumption based on what

22  was found by Ms. Schilling.

23  Q    So it's not like the agents didn't know about those

24  electronic devices when they left; is that correct?

25  A    I'm not sure if they knew of them.  Again, it's

50

1   speculation on my part, but I believe they may have overlooked

2   them.

3   Q    Do you know how long they searched the home?

4   A    I do not.

5   Q    Okay.  Have you heard the call?

6   A    I have.

7   Q    Okay.  And there's no indication that these were hidden

8   somehow in the house; is that correct?  In other words, before

9   they were sitting wherever they were sitting, there's no

10  indication they had been hidden by anyone prior to or during

11  the search; is that correct?

12  A    I didn't hear anything like that in the call.

13  Q    Okay.  And this is a search where the subjects weren't

14  called ahead of time and said, hey, we're coming to your house

15  to search, and I'm assuming that this was a executed search

16  warrant, is that correct, without prior notice?

17  A    That is correct.

18  Q    Okay.  Now, agent, do you have -- well, am I correct that

19  there is no direct evidence that Spencer is John Carter?

20  Would you agree with me on that or not?

21  A    Help me understand what you mean by "direct".  I think we

22  have several things pointing to that.

23  Q    Okay.  Let me start off with:  Did you find in any

24  searches that you have done up to now, or through informants

25  or other collection of evidence, that Spencer is the person

```
1    that set up the John Carter name and/or accounts?  Do you have

2    any evidence of that?

3    A    Not that he set them up.

4    Q    Are multiple people able to access and use the John

5    Carter account?

6    A    Yes, I would assume that anybody who has the password to

7    access the vendor account would be able to access it.

8    Q    And do you know where this vendor account was originally

9    set up?

10   A    You mean where the person was physically sitting when

11   they set the account up, or whether the --

12   Q    Yes.  Can you --

13   A    -- where the server was sitting?

14   Q    Well, let me start with that.  Well, have you been able

15   to ascertain or have you been able to figure out where the

16   person was sitting, let's start with that, when that John

17   Carter vendor account was set up?

18   A    No, no.

19   Q    Okay.  And what about the server?  Where is the server,

20   the same for the server?

21   A    Well, we don't know, but -- well, I suppose we need to

22   specify.  The John Carter -- the John Carter vendor accounts

23   operated on multiple markets, so there may -- we're likely

24   talking about multiple servers.  So in I believe two

25   instances, the markets were taken down by law enforcement, and
```

```
 1  in -- I believe, and I can confirm if I can refer to my
 2  affidavit, that the other two markets just went down.
 3         But to answer your question where those servers may
 4  have been physically located would likely be known to us from
 5  the vendor accounts that were taken down by law enforcement.
 6  The other two we would not know.
 7  Q   Okay.  But you cannot rule out, though, that multiple
 8  people, if they had the code to enter, could have accessed and
 9  used John Carter; is that correct?
10  A   That's correct.
11  Q   And you would agree that the fact that curren -- that
12  Bitcoin went into what you're alleging are wallets or accounts
13  that were kept by Spencer does not mean that he was involved
14  in the distribution or selling of drugs; is that correct?
15  A   Could you ask the question again, please, sir?
16  Q   Would you agree that the fact that Bitcoin, or portions
17  of coin, were directed and actually went into wallets or
18  accounts that you believe belong to Spencer, that that doesn't
19  mean that he was selling or distributing drugs; is that
20  correct?
21  A   I believe if you look at the totality of the
22  circumstances, it does indicate that he was involved in the
23  distribution of narcotics using the dark web.
24  Q   Well, you do not have evidence that the monies that went
25  into his wallet -- or I'm using a generic term, account -- but
```

```
 1   came directly from the sale of drugs; is that correct?

 2   A     One more time, sir?

 3   Q     Sure.  You don't have any actual direct evidence that

 4   monies that went into his wallet or accounts came from the

 5   sale of drugs.

 6   A     May I refer to my affidavit?

 7   Q     Yes, definitely.

 8   A     (Perusing document.)

 9              So in the case of AlphaBay as an example, we can say

10   that a portion of the proceeds of the sale of illicit

11   narcotics went to virtual currency accounts that were

12   associated with Spencer.

13   Q     Okay.  You don't know how many other people had access to

14   those accounts; is that correct?

15   A     That is correct.

16   Q     And do you know if Spencer traded currencies, Bitcoin or

17   other digital currency?

18   A     I know that he traded using LocalBitcoins, for example,

19   yes.

20   Q     And you didn't -- were you able to subpoena any of the

21   records from any of the accounts that pulled his wallet to see

22   the number of transactions he engaged in and when?

23   A     Are you referring specifically to -- I -- can you restate

24   the question, please?

25   Q     Sure.  Let me, just as an example, was there an account
```

```
1   at Coinbase?

2   A    Yes.

3   Q    Okay.  So let me, just as an example, in Coinbase were

4   you able to subpoena those records and determine the volume of

5   turnover or trades that he did in digital currency?

6   A    I personally did not review those records.  We had

7   another person on my team review those records.

8   Q    Okay.  Are you familiar with those records?

9   A    Not to the extent of the volume that you're asking about.

10  Q    Were you able to locate dates that match up with what

11  you're alleging were drug transactions in any of those, you

12  know, digital records?

13  A    I'm not familiar enough with the records, sir, to be able

14  to answer the question.

15  Q    Do you know how many people had access to that Coinbase

16  account, for example, other than Spencer?

17  A    I do not.

18  Q    Okay.  I want to move on now to Spencer's arrest.  Were

19  you present for Spencer's arrest?

20  A    I was present -- I was not the present -- excuse me.  I

21  was not present at his home when he was arrested, which was

22  the day the search warrant was executed.  I was present when

23  we transferred him from the jail to the U.S. Marshals.

24  Q    Did you speak with Mr. Spencer?

25  A    No.  And, uh --
```

```
 1   Q    (Inaudible.)

 2   A    May I clarify?

 3   Q    Sure.

 4   A    I don't recall speaking with him.  If I said anything, it

 5   might have just been maybe a greeting or something of that

 6   nature.

 7   Q    Mr. Spencer has made no admissions that he was involved

 8   in any form of illicit drug trade; is that correct?

 9   A    Not that I'm aware of.

10   Q    And his passport and other documents were seized from him

11   at the time of his arrest; is that correct?

12   A    I'm aware that his passport was seized.  I'm not sure

13   what other documents may have been taken with -- relating to

14   that.

15   Q    And Mr. Spencer didn't resist arrest or provide any type

16   of threats of force or violence at the time of his arrest; is

17   that correct?

18   A    That's correct, not that I'm aware of.

19   Q    And you're aware that Mr. Spencer does have a business,

20   is that correct?  A music business?  Are you aware of that, or

21   . . .

22   A    I understand he might be involved in music.  I'm not sure

23   what extent -- to what extent he runs a business associated

24   with that.

25             MR. FLEISCHMAN:  Okay.  Thank you, special agent
```

```
1   Hamblet.
2              Your Honor, I have nothing further at this time.
3              THE COURT:  Okay.  Mr. Ray, your cross-examination.
4              MR. RAY:  Thank you, Your Honor.
5                          Cross-Examination
6   BY MR. RAY:
7   Q    Good morning, special agent Hamblet.  Can you hear me?
8   A    Good morning.  Yes, sir.
9   Q    Sir, during this investigation, Mr. Dawodu was the
10  subject of your investigation; is that correct?
11  A    That's correct.
12  Q    During your entire investigation, did you ever see
13  Mr. Dawodu complete a Bitcoin transaction?
14  A    Not that I can recall.
15  Q    So during --
16  A    I should clarify -- go ahead, I'm sorry.
17  Q    During your investigation, did you observe, was there any
18  evidence that Mr. Dawodu made payments using any type of
19  cryptocurrency?
20  A    May I have a moment to refer to my affidavit?
21  Q    Yes.
22  A    (Perusing document.)
23              Could you please restate the question?
24  Q    Yeah.  During your investigation, did you ever observe,
25  or is there any evidence that Mr. Dawodu made any type of
```

```
1    payment using any type of cryptocurrency?

2    A    Not that I'm aware of.

3    Q    And during your investigation, was there -- did you

4    observe or was there any evidence that Mr. Dawodu accepted any

5    type of cryptocurrency payment?

6    A    Not that I'm aware of.  I should clarify.  I just want to

7    state for the record that there may be some instance of that,

8    but not that I can recall at the moment.

9    Q    And at no point in your investigation did you observe or

10   see evidence that Mr. Dawodu accessed the dark web?

11   A    Again, may I refer to my affidavit?

12   Q    Yes.

13   A    (Perusing document.)

14        So regarding evidence that Mr. Dawodu accessed the

15   dark web, I'm not aware of any indications with certainty that

16   he accessed the dark web, but we do see through the Internet

17   service provider at his residence at least in some cases his

18   resident -- the residential IP address associated with his

19   residence did access IP addresses that are associated with Tor

20   relays.  So while I can't say with certainty that he accessed

21   the dark web, I couldn't rule it out either.

22   Q    And so at any time during your investigation, did you

23   have -- discover any evidence that Mr. Dawodu accessed the

24   online markets through the dark net?

25   A    Not direct evidence at this time; however, I should point
```

```
 1  out that the review of electronics that were seized from his
 2  residence is ongoing.
 3  Q    So did the name John Carter or any other of the online
 4  monikers that were revealed during your investigation that
 5  were on the dark net markets, were any of those linked
 6  directly to Mr. Dawodu?
 7  A    May I refer to my affidavit once more?
 8  Q    Yes.
 9  A    (Perusing document.)
10          Not directly.
11  Q    Now, you stated that there were proceeds from -- for the
12  narcotic transactions, some of the proceeds were withdrawn to
13  a Bitcoin address ending in 4MW9; is that correct?
14  A    One moment, please.
15          Did you say 4MW9?
16  Q    Correct.
17  A    Yes, that's correct.
18  Q    And, now, that address, 4MW9, that was linked to the
19  Coinbase account that was used to pay for a hotel in Fort
20  Lauderdale; is that correct?
21  A    That's correct.
22  Q    And that hotel room that was booked using that Coinbase
23  account, that was booked under the -- under Spencer's name; is
24  that correct?
25  A    Yes, that was booked under Mr. Luis Spencer's name.
```

```
 1   Q    And the phone number that was on that reservation was
 2   also connected to Spencer, correct?
 3   A    That's correct.
 4   Q    And the e-mail address that was under that reservation
 5   was also connected to Spencer; is that correct?
 6   A    That's correct.
 7   Q    You stated that you observed meetings between Mr. Dawodu
 8   and Mr. Spencer at a storage unit; is that correct?
 9   A    That's correct.
10   Q    And you observed them taking in and out boxes?
11   A    That's correct.
12        I should clarify, I wasn't physical present during
13   that.  We had a camera installed, and so multiple people saw
14   that video, which was recorded.
15   Q    But you're not certain as to what was inside of the
16   boxes?
17   A    That's correct.
18   Q    So you can't say that there was anything illegal inside
19   of the boxes?
20   A    That's correct.
21   Q    Now, you stated that you observed Mr. Dawodu make two
22   drops, which you're saying that you observed him make two
23   drops, and drops meaning dropping packages off at the U.S.
24   Postal Service?
25   A    He was observed by people that are involved in law
```

1   enforcement, not by me personally.

2   Q    But there was two times that he was observed?

3   A    Give me just one moment, please.

4   Q    No problem.

5   A    That's correct.  There were at least two times that he

6   was observed.

7   Q    One was on July 17th?

8   A    That's correct.

9   Q    And one was on August -- or July of 2017, I'm sorry.

10  A    I'm sorry, one more time.  I show a date of July 17th,

11  2019.

12  Q    Yeah, I apologize.  July 17, 2019.

13       And then there was also another time in August of

14  2019; is that correct?

15  A    That's correct.

16  Q    You also stated that Mr. Dawodu has another pending case;

17  is that correct?

18  A    There are separate charges; for us it's the same case.

19  Q    But it stems from the same alleged operation; is that

20  correct?

21  A    We believe two separate vendor accounts are related, so

22  it's relating to a different vendor account.

23  Q    But part of the investigation is connected, both

24  co-defendants of Mr. Dawodu, they've connected them together?

25  A    Say that one more time, please.

```
 1    Q    So it's Alex Ogadu (phonetic) is the other co-defendant
 2    in his --
 3    A    That's correct.
 4    Q    -- other case?  And you have evidence connecting
 5    Mr. Ogadu (phonetic) and Mr. Spencer; is that correct?
 6    A    Yeah, I can't speak directly to the evidence we have, but
 7    we believe this is operating all as part of the same
 8    conspiracy.
 9    Q    And earlier you stated that you were not the one who
10    personally vetted the confidential informant; that's correct?
11    A    That's correct.
12    Q    So you're not sure of the relationship between the
13    confidential informant and Mr. Dawodu?
14    A    The extent of my knowledge of their relationship is from
15    reviewing records memorializing drug transactions.
16    Q    Okay.  So you're not aware if the confidential informant
17    had a personal grudge against Mr. Dawodu?
18    A    I'm not aware of that, that's correct.
19    Q    And you're not aware if they had any type of falling out
20    as prior friends?
21    A    That's correct, I'm not aware of that.
22    Q    So Mr. Dawodu, he was not the main subject of your
23    investigation; is that correct?
24    A    I'm not sure how to answer that.  You know, the -- our
25    investigation focuses on two, uh, separate monikers operating
```

1    on multiple dark net marketplaces, and we believe Mr. Dawodu

2    is involved in that business.

3    Q    And you said you believe, but is there any evidence that

4    directly ties Mr. Dawodu to one of those online monikers?

5    A    I suppose that's correct not directly, but indirectly.

6    Q    Okay.  You were present on the day the search warrant was

7    executed on Mr. Dawodu's apartment; is that correct?

8    A    I was present the day that -- I was present.  I wasn't in

9    his home during the entire process of searching his home, and

10   I can expand on that a little bit if you'd like me to.

11   Q    Well, my question is:  At any point in time, did

12   Mr. Dawodu resist being taken into custody?

13   A    He did not.

14   Q    And at any time did he display and signs of violence?

15   A    He did not.

16   Q    And during that search, there was a .9 millimeter firearm

17   recovered; is that correct?

18   A    That is correct.

19   Q    And are you aware that that .9 millimeter was registered

20   to Mr. Dawodu?

21   A    I believe that is correct.

22   Q    And so as far as you know, that he lawfully owned that

23   firearm; is that correct?

24   A    As far as I know.

25   Q    So during your investigation, you were not able to

```
 1   ascertain if other people occupied the residence at

 2   Mr. Dawodu's place; is that correct?

 3   A    Well, we -- that's not correct, and I can expand on that

 4   if you'd like.

 5   Q    Yes, please.

 6   A    So when we executed the search warrant, we discovered

 7   that the home was subdivided into three efficiency units, and

 8   we were not aware of that leading up to the warrant.  And when

 9   we were -- so the main building of the residence was divided

10   into, like I said, three units.  Mr. Dawodu occupied the

11   center unit, and we encountered other people within his

12   efficiency unit when we arrived.

13   Q    And you don't know who those other people are; is that

14   correct?

15   A    We -- we did gather there identities when the search

16   warrant was being executed.

17   Q    But you were not aware of any relationship, if any at

18   all, between Mr. Dawodu and the other residents of that

19   efficiency apartment?

20   A    As I said, when we executed the warrant we thought it was

21   one residence.  It wasn't until we arrived at the residence we

22   realized it was divided into three.  So, and we were also

23   aware of some of the other individuals present at the

24   residence when the search warrant was executed; however, we

25   didn't know the extent of their -- the relationship of those
```

| | |
|---|---|
| 1 | other people to Mr. Dawodu. |
| 2 | Q    Now, during your investigation, so the investigation had |
| 3 | started back in 2017; is that correct? |
| 4 | A    I believe so, yes. |
| 5 | Q    But Mr. Dawodu is not mentioned in your report until |
| 6 | 2019; that's correct? |
| 7 | A    You know, if we can . . . may I step back to your |
| 8 | previous question? |
| 9 | When the -- the date that our case opened, I'm not |
| 10 | sure of the date that the case opened.  What I -- what I was |
| 11 | recalling when I answered the last question was the date of |
| 12 | the AlphaBay server.  So I'm not sure the exact date that our |
| 13 | case was initiated. |
| 14 | Q    But in your report, you date back to transactions and |
| 15 | incidents that go back to 2017; is that correct? |
| 16 | A    In the affidavit, sir? |
| 17 | Q    Yes. |
| 18 | A    So we make reference in the affidavit, or I make |
| 19 | reference, rather, in the affidavit, of John Carter 7 |
| 20 | operating as a vendor on AlphaBay since 2017, but then our |
| 21 | undercover purchases that are referenced in the affidavit |
| 22 | don't begin until 2019. |
| 23 | Q    And again, Mr. Dawodu was not mentioned in your affidavit |
| 24 | or in the indictment until 2019; is that correct? |
| 25 | A    I believe that's correct, yes. |

```
 1              THE COURT:  Mr. Ray, I don't want to cut you short,
 2   but we are going to need to move along with the hearing --
 3              MR. RAY:  Yeah.
 4              THE COURT:  -- rapidly.  If there are specific
 5   points you want to make, I'd suggest you direct yourself
 6   towards them.
 7              MR. RAY:  Yes, Your Honor.  I only have a couple
 8   more questions.
 9   BY MR. RAY:
10   Q    So there were multiple purchases made by undercovers in
11   this investigation, correct?
12   A    That's correct.
13   Q    And it looks like in 2000' -- from March to June of 2019,
14   there were five undercover purchases?
15   A    There were at least five, that's correct.
16   Q    And then from April to December 2019, there was at least
17   six?
18   A    That's correct.
19              MR. RAY:  Nothing further, Your Honor.
20              THE COURT:  Okay.  Thank you.
21              Any redirect, Mr. Jones?
22              MR. JONES:  Yes, Your Honor.
23                      Redirect Examination
24   BY MR. JONES:
25   Q    Agent Hamblet, (inaudible) conceding to the relationship
```

```
 1   between defendant Dawodu and defendant Spencer, are you
 2   familiar with any -- the connections or the amount of times
 3   that they had met during your investigations?
 4   A    I can't tell you the exact number, but we are aware that
 5   they -- they were observed during physical surveillance
 6   meeting on numerous occasions.
 7   Q    Have they ever -- has Mr. Dawodu ever gone to
 8   Mr. Spencer's residence?
 9   A    I can't tell you with certainty.  I believe we have seen
10   Mr. Spencer go to Mr. Dawodu's residence.
11   Q    Okay.  Would it help you refresh your recollection if you
12   took a look at your affidavit?
13   A    Yes.
14   Q    If I can direct you to paragraph 26.
15   A    (Perusing document.)
16             Yes, that's correct.  Mr. Dawodu was observed on
17   multiple instance at Mr. Spencer's residence.
18             THE COURT:  Mr. Jones, when you refer to the
19   affidavit, are you referring to the complaint affidavit?
20             THE WITNESS:  The search warrant affidavit, sir.
21             THE COURT:  Okay.  Thank you.
22   BY MR. JONES:
23   Q    And are there phone records between Dawodu and Spencer
24   communicating?
25   A    Yes.
```

```
 1    Q    And how many times approximately had they communicated

 2    between June 2019 and November 2020?

 3    A    May I refer to the affidavit?

 4    Q    Of course.

 5    A    (Perusing document.)

 6              Could you say the dates one more time, please?

 7    Q    Between June 2019 and November 2020, approximately how

 8    many times have they communicated based on toll records?

 9    A    I apologize.  I'm trying to find that spot in my

10    affidavit.

11    Q    Twenty -- it's paragraph 26, I can direct your attention.

12    A    That's correct.

13    Q    I asked you approximately how many times.

14    A    Oh, I'm sorry.  Law enforcement observed approximately

15    1496 calls between Spencer and Dawodu between June 17th of

16    2019 and November 15th of 2020.

17    Q    Does that overlap with the investigation regarding these

18    Fentanyl-pressed pills?

19    A    It does.

20    Q    Do you recall obtaining iCloud data from Mr. -- defendant

21    Dawodu's iCloud account?

22    A    Yes.

23    Q    Do you recall whether they ever exchanged Bitcoin wallet

24    addresses between defendant Spencer and defendant Dawodu?

25    A    Let me -- just one moment, please.
```

```
 1   Q    Would it help your recollection if I referred you to a --
 2   or showed you a Cellebrite?
 3   A    Yes.
 4   Q    (Inaudible.)
 5             MR. JONES:  Your Honor, if I may share my screen
 6   real quick?
 7             THE COURT:  Sure.
 8   BY MR. JONES:
 9   Q    Can you see my screen, the extraction report?
10   A    Yes, sir.
11   Q    Do you recognize what this is?
12   A    I do.
13   Q    What is it?
14   A    It's an extraction report from an iCloud backup.
15   Q    Do you recognize the phone numbers associated with this
16   backup?
17   A    I do.
18             THE COURT:  Let me just interrupt.
19             Mr. Jones, the rules -- the typical rules of
20   evidence don't apply here.  Do you want to proffer what you're
21   trying to get from the extraction report and we can see if
22   special agent Hamblet agrees with that or not?
23             MR. JONES:  Yes, Your Honor.
24             I could just proffer that on or around August 26,
25   2019, defendant Spencer and defendant Dawodu exchanged a
```

```
 1    Bitcoin wallet address that I'm showing on the screen right
 2    now.
 3              THE COURT:  Special agent, is that your recollection
 4    from the iCloud data?
 5              THE WITNESS:  Are you asking me, Your Honor?
 6              THE COURT:  Yes.
 7              THE WITNESS:  Yes, yes, Your Honor.
 8    BY MR. JONES:
 9    Q    Thank you.
10              And referencing the original cross-examination from
11    Mr. Fleischman, during -- are you familiar with the undercover
12    purchases on June 28th, 2019 and December 9th, 2019, as
13    reflected in paragraphs 21 and 22 of the affidavit?
14    A    I am.
15    Q    And those -- weren't those -- weren't those transactions
16    directly tied back to a Bitcoin address associated with
17    defendant Spencer, and specifically his e-mail account
18    associated with the address, Mr. Spencer's address?
19    A    That's correct.
20              MR. JONES:  No further questions, Your Honor.
21              THE COURT:  Thank you, special agent Hamblet.
22              Is there any further -- oh, actually, wait, before
23    you step down, I don't know if this is something the special
24    agent can address and maybe the defendant will be able to
25    address.  Is there any -- is there an immigration detainer
```

```
 1   against -- formally lodged against Mr. Spencer?
 2              THE WITNESS:  Is that for me, Your Honor?
 3              THE COURT:  If you know.
 4              THE WITNESS:  I believe there -- as of a couple of
 5   weeks ago, there was an immigration detainer for Mr. Spencer,
 6   which we provided to the U.S. Attorney's Office, and I believe
 7   that was forwarded to his attorney.
 8              THE COURT:  Okay.  Thank you.
 9              Okay.  You may step down, special agent Hamblet.
10              Mr. Jones, any further evidence that the government
11   wants to present?
12              MR. JONES:  No further evidence, Your Honor.  Just
13   argument.
14              THE COURT:  Okay.  Mr. Fleischman, is there any
15   evidence to present from Mr. Teixeira-Spencer, or -- I'll hear
16   argument from you --
17              MR. FLEISCHMAN:  I do have --
18              THE COURT:  Is there any evidence to present?
19              MR. FLEISCHMAN:  I wanted to proffer first our --
20   and I have the witness available regarding our bond proposal.
21              THE COURT:  Please, yes.
22              MR. FLEISCHMAN:  So, and we've met him initially.
23   He was on Zoom.  He's still on.  I'm not sure if I'm
24   pronouncing this right, Laucio (phonetic) Teixeira is the
25   defendant's cousin.  They reside in Rhode Island.  He owns a
```

home together with his mom, the address of which is 55
Edgeworth Avenue, Providence, Rhode Island, 02904.  The
defendant's aunt, this witness' mother, is Laurinda Teixeira.
Laucio is a sales rep for Kitu Super Coffee.  He's lived in
Rhode Island for 29 years.  The mom, the defendant's aunt, is
currently temporarily unemployed, working for a banquette
company because of COVID, but she intends to go back as soon
as that's completed.  The home they own is worth approximately
350,000.  The mortgage is down to 125,000.

          Our proposal is that the defendant would live with
them in Rhode Island.  We would -- and Laucio would --
Teixeira would sign on a personal surety or, you know, the --
what's left as far as the equity in the home.  And we would
also propose either house arrest or electronic monitor,
depending on what's available in Rhode Island.  And the family
also has savings of between 13 and 15,000 that they would be
willing to post as a personal surety, as a corporate surety
bond on behalf of the defendant in this case.

          So, again, just to summarize, Your Honor, we would
be requesting a personal surety secured by the residence in
Rhode Island, signed by both Laucio Teixeira and his mother,
Laurinda Teixeira, the aunt, and first cousin of Mr. Spencer.
Additionally, they would be willing to post a corporate
surety.  The maximum funds they have to do that is 15,000,
which come from both of them having worked full-time.

```
 1              THE COURT:  Mr. Fleischman, what was your
 2    understanding of Mr. Teixeira-Spencer's immigration status and
 3    whether there's an immigration detainer lodged that would put
 4    him in immigration custody if he were released?
 5              MR. FLEISCHMAN:  There is an immigration detainer,
 6    but he has hired an immigration attorney, but it's something
 7    that even if you awarded bail at this point or some form of
 8    pretrial release, they cannot just rush out and take care of
 9    that.  The immigration issue would have to be addressed first.
10    But, so that's the status.  And as of now, there is an
11    immigration detainer.  They hired an immigration attorney.
12              And I don't know if you're ready for me to argue or
13    not, if you want the government to go first, but I did want to
14    address his background, the Pretrial Services report, and the
15    documents I filed from Rhode Island as defense exhibits would
16    show that he pled to a misdemeanor there.
17              THE COURT:  Okay.
18              MR. FLEISCHMAN:  If you want me to go, I can do that
19    now, or if you want the government to go.
20              THE COURT:  Well, what I'm going to do, what I'm
21    going to do, Mr. Ray, what I'm going to do is hear argument
22    from the government and Mr. Fleischman regarding
23    Mr. Teixeira-Spencer, and then we will -- I'll hear from you
24    as to any evidence you want to present as to Mr. Dawodu and
25    move to argument for him.  Okay?
```

```
1              MR. RAY:  Thank you, Your Honor.
2              MR. FLEISCHMAN:  And also if the government wanted
3    to question Laucio Teixeira, he is present on Zoom.
4              THE COURT:  Mr. Jones, would you like to
5    cross-examine Mr. Teixeira?
6              MR. JONES:  No, Your Honor.
7              THE COURT:  Okay.  So let me hear argument from
8    Mr. Jones.
9              MR. JONES:  Thank you, Your Honor.
10             As previously referenced, we believe there's
11   probable cause at this point to determine that Mr. Spencer and
12   Mr. Dawodu both committed the offense as charged in the
13   indictment, at which point the -- there's a rebuttable
14   presumption that there's no reasonable conditions that can
15   assure their appearances and maintain the safety of the
16   community.
17             In this instance, we are dealing with a extreme
18   amount of Fentanyl, which, as referenced previously in the
19   factual proffer, is a very dangerous drug that causes a lot of
20   death in our country with the opioid crisis, and these --
21   Mr. Spencer and Mr. Dawodu have been distributing these
22   Fentanyl-laced pills that can cause this danger.
23             In addition to the underlying problems with the --
24   their ability to distribute this from home or from anywhere,
25   this is two gentlemen, or I can reference Mr. Spencer now, but
```

```
 1   obviously very capable of hiding his ability to sell drugs,
 2   work on the dark net and use Bitcoin to fund his life.  So we
 3   are in a situation where if any -- even if they were released
 4   at home, we cannot monitor their ability to continue to
 5   function and sell drugs, as they seem very good at doing.
 6        The charge that he's facing is obviously
 7   substantial.  There's a 10-year minimum sentence, and his
 8   guidelines are upwards of 15, or 150 months.  But we also have
 9   to take into account that he has no legal status in the United
10   States, has ties to Cape Verde and could flee and fund his
11   flight with his illicit proceeds that we may not have our
12   hands on at this point.  He had $12,000 in cash in his home
13   when the residence was searched, and this is consistent with
14   behavior of someone that can hide, stash money and be able to
15   flee at the drop of a hat.
16        In addition, we have evidence from his jail calls
17   that he's not afraid to obstruct justice.  He directed his
18   live-in girlfriend to destroy evidence, and I think that's
19   indicative of Mr. Spencer's character, which is something this
20   Court should consider in the factors.
21        In addition, we know that he's used marijuana
22   consistently, which is another factor for this Court to
23   consider, his substance abuse.
24        And that is all I have to present for Mr. Spencer.
25        THE COURT:  Mr. Fleischman, your argument.
```

1        MR. FLEISCHMAN:  Judge, let me start off with, if I
2   could, before I get to our view of the facts, the Pretrial
3   Services report.  I want to note, Your Honor, that he
4   literally, other than the misdemeanor in Rhode Island, he has
5   no criminal history whatsoever.  But although he does have a
6   detainer currently, he is -- there's no evidence -- and he
7   denied this to, as well, to Pretrial Services, that he's left
8   the United States.  I mean, he's literally grown up here.
9   He's totally assimilated into the U.S.  He has no connection
10  nor does he want to go back to Cape Verde.  There's no
11  evidence he's ever left the U.S., period.  They have his
12  passport; it would be impossible for him to leave this
13  country.  All his ties are here.  His family lives in Rhode
14  Island and South Florida.

15        There's no evidence that he's a risk of danger to
16  the community.  There's no prior acts of violence.  No
17  firearms were found on him or in his home.  He was never seen
18  with any form of weapon during surveillance that took place in
19  this case.  So I would say that danger to the community, zero.
20  And risk of flight I would say, you know, obviously in any
21  criminal case there's a risk of flight, but I would say that
22  that is almost zero on the part of Mr. Spencer.

23        Addressing the -- addressing the facts of this case,
24  it's our position that for Mr. Spencer there's barely probable
25  cause, barely.  And I want to emphasize the fact that one of

```
 1   the strongest points that the government has is that it
 2   appears that currency, digital currency from the sale of
 3   drugs -- and this in the light most favorable to the
 4   government -- may have gone into wallets, or I'm using that
 5   term broadly, that the defendant had access to.  This is the
 6   problem with their theory of the case and claiming to have
 7   probable cause for this is that multiple people have access to
 8   those accounts, and they cannot say who accessed the accounts,
 9   they can't say who the money was to be sent into the account
10   for, if, in the light most favorable to the government, you
11   know, it was actually drug money that was sent to those
12   accounts, and there's no evidence that Spencer knew that money
13   for drugs were going into those wallets, period.
14            So the fact that he later rented a hotel room with
15   Bitcoin, so what?  That doesn't prove that he was using drug
16   proceeds.  And they know that he trades Bitcoin and other
17   digital currency, which could account for a large amount of
18   transactions.
19            They did surveillance.  They never saw him with
20   drugs, they never saw him with weapons, they never saw him
21   mail at a postal center or a United States Post Office any
22   form of drugs.  No CI had contact with him.  They did a search
23   of his home, found no drugs.  They never searched the storage
24   unit.  There's no evidence that that was used for anything
25   illicit.
```

```
 1              There's pole -- apparently their surveillance of him
 2   with the co-defendant.  So what?  I mean, there's no evidence
 3   that at that time they're engaged in any type of illegal
 4   activity, period.
 5              So it's complete conjecture on the government's
 6   part.  There's barely probable cause in this case to even
 7   charge and arrest him for this.  And the fact that he told the
 8   girlfriend, again, in the light most favorable to the State
 9   (sic), to get rid of the computers, the computers were there
10   during the search and the police left them.  That was their
11   decision to leave them.  Also, they're not even evidence at
12   this point.
13              And they did a search of the home, found only U.S.
14   currency.  There's no evidence the currency is linked to
15   drugs.  He has a music business which the agent is somewhat
16   aware of.
17              So I would say at this point, Your Honor, first of
18   all, we shouldn't have to rebut the presumption, but if you
19   find that the government's evidence rises to that --
20              THE COURT:  Mr. Fleischman, the grand jury's
21   returned an indictment here finding probable cause.  Why
22   shouldn't you have to rebut the presumption?
23              MR. FLEISCHMAN:  Okay.  Well, let's -- I agree,
24   there is an indictment in this case.  I would say
25   overwhelmingly we have rebutted the presumption.
```

```
 1              So we're asking the Court to at this point -- he
 2   can't -- obviously at this point he can't get out, but I'm
 3   asking the Court to, you know, put together a bond package
 4   where a personal surety with the home in Rhode Island where he
 5   would reside would be, you know, posted as collateral, and
 6   then if the Court felt it necessary, although I don't see why
 7   it would be necessary on top of that, an additional corporate
 8   surety bond or even some form of 10 percent bond with the
 9   clerk, with electronic monitor of him in Rhode Island and the
10   ability to travel to South Florida and, you know, Rhode Island
11   and obviously Washington, D.C., if he's out of custody.
12              But that's our position, Your Honor.
13              THE COURT:  A couple questions.
14              First of all, as to your bond conditions, why would
15   he need to travel to South Florida --
16              MR. FLEISCHMAN:  Because he still has --
17              THE COURT:  -- (inaudible) Rhode Island, is going to
18   be living in Rhode Island, and the court proceedings are in
19   D.C., for what reason would he have to travel back to South
20   Florida?
21              MR. FLEISCHMAN:  Because he still has family here.
22   And although obviously he's not going to live with his
23   girlfriend, I mean, there's no indication that they're on bad
24   terms.  It's our -- just because of everything that went on
25   with the phonecall and the, you know, that situation, we felt
```

```
 1   it better to propose that he live with, you know, the family

 2   in Rhode Island, so . . .

 3           THE COURT:  Who is the family in South Florida?

 4           MR. FLEISCHMAN:  Well, he has Claudia Schilling, who

 5   is his, you know, live-in partner.  And then he has other

 6   family members in the South Florida area.  But he -- if you

 7   restricted him only to Rhode Island, so, you know, he could

 8   certainly live with that.

 9           THE COURT:  Let me ask this:  With the immigration

10   detainer, you said that he has no intent to go back to Cape

11   Verde or otherwise leave the United States.  How am I supposed

12   to deal with that?  Immigration may not actually give him that

13   choice.

14           MR. FLEISCHMAN:  Well, he intends to fight, you

15   know, deportation.  He's hired an immigration attorney.  He

16   has zero interest in going back to a country in that area, in

17   Cape Verde.  But he's been in the United States since he's 11

18   years old.  So, I mean, absent this case, I'm not even sure

19   that DACA could be ruled out.  I don't know, I don't do

20   immigration work, but he's been here since he's 11 years old.

21   He's completely assimilated to this country.  So he does not

22   intend to just say, okay, deport me, because he does not want

23   to -- for all intents and purposes, other than not having U.S.

24   citizenship, he's here, so . . .

25           THE COURT:  Let me -- Mr. Jones, is there anything
```

```
 1   you want to respond to?

 2             MR. JONES:  Just that he has family in Cape Verde.

 3   His mother is there.  There's somewhere for him to go and make

 4   a start, and when you're facing a minimum of 10 years in

 5   prison, anyone can change their plans to have their

 6   immigration attorney to stop fighting also.

 7             THE COURT:  As to Mr. Spencer, the Court must

 8   determine whether the government's met is burden of proving

 9   that no condition or combination of conditions reasonably

10   assure the defendant's appearance as required, and the safety

11   of the community.

12             As to appearance in court, the government's burden

13   is by a preponderance of evidence, that's more likely than

14   not.  As to danger, it's by clear and convincing evidence.

15   That means evidence sufficient to create an abiding conviction

16   that future danger is highly probable.  The Court has to first

17   assess the extent of any risk, whether any condition, or

18   combination of conditions, would mitigate that risk.

19             There is an indictment in this case establishing

20   probable cause that the defendant committed the charged

21   offenses, and that does create a rebuttable statutory

22   presumption that no condition or combination of conditions

23   could reasonably assure the defendant's appearance as

24   required, and the safety of the community.

25             Regardless of the presumption, the government
```

```
 1  retains its burden of proving that there's no condition or
 2  combination of conditions I can set.
 3           There are a number of factors I must consider,
 4  including the nature and circumstances of the offense, weight
 5  of the offense (sic), the history and characteristics of the
 6  defendant, and the nature and seriousness (inaudible).
 7           The nature of the -- I am ultimately going to find
 8  that while I think it is a close call, I think there are
 9  conditions I can set that will reasonably assure the safety of
10  the community and (inaudible).
11           The nature and circumstance of the offense.  The
12  offense is certainly serious, given its involvement with
13  Fentanyl, as Mr. Jones has certainly underlined.
14           The weight of the evidence I think is much stronger
15  than what Mr. Fleischman has characterized it as.  However, it
16  is still based on a lot of circumstantial evidence.
17           In terms if history and characteristics, the
18  defendant has minimal criminal history.  He does, while he has
19  family ties, and while he does have family ties to Cape Verde,
20  he also has ties to the United States and has been here, as
21  Mr. Fleischman said, since he was 11 years old.  I do note
22  that while there is a detainer against him, according to the
23  Pretrial Services report, he has at least sought to remain
24  here through the DACA program, and that suggests to me that
25  although Immigration may not ultimately give him the choice,
```

1  he does want to remain.

2       The nature and seriousness of the danger that he

3  poses has to do with his continued activity if he were to

4  continue the activity that's in the indictment.  I think there

5  is a substantial risk there, because he was apparently able to

6  conduct all of the alleged activity from his home and through

7  the dark net, which is difficult to monitor.  At the same

8  time, the lack of criminal history involved suggests to me

9  there's not substantial evidence here that he is not going to

10  be deterred by the significant conditions of bond under which

11  he will be subject.

12       Because of that, I don't think I can determine that

13  there's no conditions, even with a presumption, there are no

14  conditions that I can set that would reasonably assure that he

15  won't continue the alleged conduct while on bond.

16       So based on that, I am going to impose the following

17  bond for Mr. Teixeira-Spencer.  Mr. Teixeira, I want you to

18  listen very closely, because if you violate any of these

19  conditions of your bond there's severe consequences.  One, you

20  could be obviously placed back in custody.  Number two, the

21  bond could be revoked (inaudible) be serious financial

22  consequences both for you and the family members who are going

23  to have to cosign on this bond for you.

24       I'm going to set two bonds.  First, I'm going to set

25  a $150,000 personal surety bond.  It has to be cosigned by the

```
 1   defendant's cousin, Lucio Teixeira, and the aunt.
 2              Mr. Fleischman, can you give the aunt's name again,
 3   please?
 4              MR. FLEISCHMAN:  Yes, Your Honor.
 5              The aunt is -- I'll spell it.  I'll say it first and
 6   then spell it.  Laurinda Teixeira.  Laurinda is spelled
 7   L-a-u-r-i-n-d-a, and Teixeira is (inaudible) in the
 8   indictment, T-e-i-x-e-i-r-a.
 9              THE COURT:  That's Laurinda Teixeira.
10              I'm also going to impose a $100,000 10 percent bond
11   with a Nebbia condition that also must be cosigned by the
12   defendant's cousin and his aunt.
13              I'm also going to impose the following standard and
14   special conditions:
15              First and foremost, Mr. Teixeira must appear before
16   this Court or the court in the District of Columbia as
17   directed, whether that's remotely or in person.  Mr. Teixeira,
18   make sure that you abide by that condition.  Violating that
19   not only brings the consequences I've already told you about,
20   but you could also be possibly separately prosecuted for
21   failure to appear.  Do you understand that?
22              THE DEFENDANT:  Yes, sir.  Yes, Your Honor.
23              THE COURT:  Your travel is restricted to the
24   District of Rhode Island and the District of Columbia, and
25   travel to the District of Columbia is only for the purpose of
```

```
 1   court appearances.

 2           You must reside at the residence of your cousin and

 3   aunt, and you may not change that residence without approval

 4   of probation or the Court.

 5           You must cooperate with law enforcement in the

 6   collection of DNA.

 7           While on bond, you must not violate any federal,

 8   state or local law.  If you come in contact with law

 9   enforcement, you must report that contact within 72 hours.

10           You are to surrender all passports and travel

11   documents if you have any.  While on bond, you are not to

12   obtain any travel documents.

13           You must report to Pretrial Services as directed.

14           I'm not going to impose an employment restriction,

15   because I am going to place you on house arrest in your

16   cousin's home with location monitoring, and we'll get to that

17   in a moment.

18           You are to avoid all contact with any victims or

19   witnesses in this case except through counsel.  The government

20   will provide a list of those people to your counsel.  You're

21   also to avoid all contact with any known co-defendant or

22   identified co-conspirator except through counsel.  Again, the

23   government will provide a list of those people.

24           While on bond, you must not possess a firearm or any

25   other destructive devices.
```

Neither you nor the other signatories on the bond
may pledge or otherwise encumber the property while you're on
bond.

                    Do not visit any commercial transportation
establishment except as necessary to travel to the District of
Columbia for court appearances or to travel to Rhode Island
once you are released.

                    You're going to be on home detention at the home of
your cousin subject to GPS monitoring unless Pretrial Services
tells the Court that such monitoring is not available in the
district where you are being sent.  If that's the case, they
can notify the Court, make an amendment of the bond.

                    The home detention is subject to (inaudible)
exceptions for medical appointments, court appearances or
attorney visits.

                    If I didn't make it clear, the 10 percent bond is
subject to a Nebbia condition.

                    Mr. Jones, are there any further restrictions on
bond that you would like (inaudible)?

                    MR. JONES:  Just to make sure that there's no
ability for him to have access to electronics with Internet
access.  Based on the nature of these crimes and the link to
drugs being able to be distributed and sold online, I think
it's important for the safety of the community to prohibit
that.

1    THE COURT:  Yeah, I've considered that, that kind of
2    restriction.  I think the problem is that especially in our
3    current environment, with court hearings occurring by Zoom, as
4    well as just about every other kind of meeting, I don't know
5    if I can impose that full kind of restriction with -- and
6    allow him to both appear in court, communicate with his
7    attorney, possibly conduct other legitimate business.
8            I can order that he not access any Tor or dark net
9    services in any way, although (inaudible) I'm not sure how
10   that can actually be monitored.
11           MR. JONES:  With a provision that probation can come
12   check the history in his electronic devices.
13           THE COURT:  Mr. Fleischman, what do you think about
14   that condition?
15           PROBATION OFFICER:  I'm sorry, Your Honor, I did not
16   hear Mr. Jones.
17           MR. FLEISCHMAN:  I couldn't hear, I'm sorry.
18           THE COURT:  (Inaudible) Mr. Jones is suggesting is
19   that probation be allowed to conduct (inaudible) searches of
20   any electronic devices to confirm that he is not accessing any
21   dark web or Tor services.
22           PROBATION OFFICER:  Your Honor, if -- I believe -- I
23   know this is not a sex offense charge, but I know there is
24   something that we have to control whenever those cases are
25   allowed to have Internet access, and I believe it's called

```
 1   remote.com, but I need to make sure that that's something that
 2   we can do in these type of offenses.  If I can just make a
 3   quick phonecall?
 4          THE COURT:  Well, we do need to move on.  So what
 5   I'm going to -- let me ask Mr. Fleischman, what is your
 6   position on some sort of Internet restriction?
 7          MR. FLEISCHMAN:  Judge, I'm familiar with the
 8   software probation is mentioning.  I have -- I mean, he needs
 9   to be able to access the Internet especially -- I'm not going
10   to -- if I do represent him or continue, I'm not going to be
11   flying to Rhode Island, I mean, at least not on a regular
12   basis.  So he needs access to the Internet.  If that's what it
13   takes, I'm fine with that.  I know it works on the sex offense
14   cases.  I don't have a problem with it.
15          THE COURT:  I'm not going to impose that restriction
16   right now.  If the government, in consultation with pretrial,
17   can come up with a reasonable formulation of that restriction,
18   I'd ask you either submit that to me or to the court in the
19   District of Columbia as a modification of the bond.
20          But we do need to move on, and I don't want to take
21   the time to (inaudible).
22          MR. FLEISCHMAN:  So, Judge, one other question.
23          THE COURT:  Hold on, Mr. Fleischman.  Hold on,
24   please.
25          MR. FLEISCHMAN:  Okay.
```

```
 1            THE COURT:  Mr. Jones, is there anything else that
 2   you are recommending?
 3            MR. JONES:  Yes, yes, Your Honor.  I would just
 4   request that we get a brief stay on the bond so that the AUSAs
 5   in D.C. can appeal to an Article III.
 6            THE COURT:  I will grant a stay of the (inaudible)
 7   if there is going to be an appeal.  I'll stay the order for
 8   three days pending appeal.
 9            MR. JONES:  Thank you, Your Honor.
10            THE COURT:  Mr. Fleischman --
11            MR. FLEISCHMAN:  Yes, Your Honor.
12            THE COURT:  -- (inaudible).
13            MR. FLEISCHMAN:  I had a question.  Just I wanted to
14   address this ahead of time.  Will he still be allowed contact
15   with Claudia Schilling?  He has not, on my advice, had contact
16   with her since the -- but, I mean, they were living together.
17   They have a full -- fully formed relationship, and I'm
18   requesting that he be allowed to have contact with her.
19            THE COURT:  What's the government's position as to
20   whether she's a witness or potential co-conspirator?
21            MR. JONES:  At this point she's a potential -- based
22   on what I know and what the government knows, it sounds as if
23   she's a potential co-conspirator based on her jail call with
24   the defendant.
25            MR. FLEISCHMAN:  Judge, I would ask that you almost
```

```
 1   treat her as a wife.  I mean, even husband and wife who --
 2   and, I mean, we represent a husband and wife, my brother and
 3   I, in the past, and they're (inaudible).
 4            THE COURT:  (Inaudible) his girlfriend at this time
 5   (inaudible).
 6            Any other questions, Mr. Fleischman?
 7            MR. FLEISCHMAN:  No, Your Honor.  That will be it.
 8   Thank you.  Thank the government.
 9            THE COURT:  Anything else from probation?
10            PROBATION OFFICER:  Yes, Your Honor.  We would like
11   to respectfully request substance abuse testing based on
12   what's on the Pretrial Services report when he reported during
13   his interview.
14            THE COURT:  I'll recommend -- I'll impose a
15   restriction of substance abuse testing as --
16            PROBATION OFFICER:  Just to remind counsel and the
17   defendant, once he's released, if he's released depending on
18   the appeal, he needs to contact our office.  I'm going to send
19   the phone number to his attorney.  I know this is a DC case,
20   but the bond was issued here, so he needs to come and call us
21   so that we can give him instructions on where to go once he's
22   released for DC.
23            MR. FLEISCHMAN:  Thank you.
24            THE COURT:  As to the removal, Mr. Fleischman, you
25   indicated that he's waiving removal; is that correct?
```

MR. FLEISCHMAN:  That is correct, Your Honor.  We're

not contesting removal.

          THE COURT:  Mr. Teixeira, you do have the right to a

hearing where the government would have to establish that you

are the person (inaudible) named in the indictment, and you're

saying (inaudible) waive that hearing and appear in the

District of Columbia as directed; is that correct?

          THE DEFENDANT:  Yes, yes, Your Honor.

          THE COURT:  Okay.  I'll accept the waiver of

removal, then.

          Is there anything else we have to address as to

Mr. Teixeira-Spencer?

          MR. FLEISCHMAN:  No.

          MR. JONES:  Not from the government, Your Honor.

          THE COURT:  Okay.  Mr. Ray, as to Mr. Dawodu --

          I'm sorry, everyone, we need to take just a

two-minute break before I hear evidence from Dawodu.  Let's

stand in recess for two minutes, please.

     (A recess was taken.)

          THE COURT:  Okay.  Let's continue with the evidence

for Mr. Dawodu.  Mr. Ray, what --

          UNIDENTIFIED SPEAKER:  Judge, one second.  Mr. Ray

just stepped out.  He will right back.  One second, Judge.

          THE COURT:  Mr. Ray.

          MR. RAY:  Yes.  I apologize, Your Honor.

```
 1              We were asking for essentially similar conditions to
 2    release as Mr. Spencer.  I have on Zoom here Ms. Rochelle
 3    Rose.  She is Mr. Dawodu's best friend, has been for over 16
 4    years.  She's an oncology pharmacy technician at the
 5    University of Miami hospital.  She owns a house.  It's located
 6    at 11225 Northeast 12th Avenue, that's in Miami, 33161.  She
 7    has a house with a bedroom that she is willing to open up her
 8    house and have Mr. Dawodu stay with her.  It's her and her two
 9    children.
10              Like I said, this has been his best friend for
11    almost 16 years.  They've -- since he moved here to the United
12    States 16 years ago.  She is willing to take him in.  She's
13    willing to, you know, support him in any way.  She said that
14    she's willing to do anything to help ensure that he does not
15    violate any of the conditions of his release.
16              You know, she has her two children there, that they
17    refer to him as his (sic) uncle.  He's been in their life, you
18    know, almost the children's entire life.  They're age 10 and
19    age 18.
20              Furthermore, I also have Ms. Jamilla Boule
21    (phonetic), who is Mr. Dawodu's girlfriend.  She currently
22    lives in Atlanta; however, if Mr. Dawodu is granted release
23    and is able to live with Ms. Rochelle Rose, his girlfriend,
24    Ms. Boule, is going to do everything in her power to move down
25    here to South Florida to be close to him.  She has also said
```

```
 1    that she wants to do anything in her power to help Mr. Dawodu,
 2    and that's including if he has to appear in the District of
 3    Columbia for any appearings, she would be traveling with him.
 4    She would be ensuring that he would show up to any court
 5    appearance that he needs to be at.
 6              Furthermore, both Ms. Rochelle Rose and Jamilla
 7    Boule would be willing to cosign on any bond.  And, again,
 8    just to reiterate, we would be asking for, you know, similar
 9    conditions with the personal surety bond, the home detention
10    with the GPS monitor, and any other conditions that Your Honor
11    would think would be appropriate for his release.
12              THE COURT:  Mr. Ray, what -- is there any monetary
13    collateral that Ms. Rose and Ms. Boule is willing to deposit
14    in the court as to secure a -- secure the monetary bond?
15              MR. RAY:  I do need to discuss that more in detail
16    with them, but, Your Honor, if we -- I'm sure that between the
17    two of them, that they could come up with somewhere around
18    $10,000.
19              THE COURT:  Anything further from you, Mr. Ray?
20              MR. RAY:  Nothing for that, Your Honor.
21              THE COURT:  In terms of evidence or proffer.
22              MR. RAY:  Just argument, Your Honor.
23              THE COURT:  Mr. Jones, your argument, please.
24              MR. JONES:  Argument, Your Honor?
25              THE COURT:  Yes.
```

| | |
|---|---|
| 1 | MR. RAY: Yes. Consistent with the arguments |
| 2 | against Mr. Spencer, I reiterate that the burden here, there |
| 3 | is probable cause to find him guilty, or that he committed the |
| 4 | crimes as alleged, and that there is a rebuttable presumption |
| 5 | that there's no set of conditions that can assure his |
| 6 | appearance and the safety of the community. |
| 7 | Again, we're dealing with Fentanyl. I want to be -- |
| 8 | I just want to stress that the ability for these gentlemen to |
| 9 | sell this drug that can cause overdoses and kill individuals |
| 10 | in an opioid crisis is serious. |
| 11 | In addition, specific to Mr. Dawodu, he's got |
| 12 | substantial ties to Nigeria, including his parents and |
| 13 | siblings who live there. This contributes to his risk of |
| 14 | flight. He would be able to restart life or connect with his |
| 15 | family and live there for -- to avoid his 10-year minimum |
| 16 | sentence. He is not married; he has no children. He does |
| 17 | have a substance abuse issue, consistent marijuana usage. |
| 18 | He's got a -- we don't have a significant criminal history, |
| 19 | but there is a charge for prior possession of marijuana. |
| 20 | But in general, Your Honor, I think the danger to |
| 21 | the community is a big push here, and to the extent this Court |
| 22 | is inclined to grant a bond, we would also request a stay for |
| 23 | this defendant, as well, for an appeal. |
| 24 | THE COURT: Okay. Thank you, Mr. Jones. |
| 25 | Mr. Ray, your argument. |

```
 1            MR. RAY:  Thank you, Your Honor.

 2            I do want to point out on his Pretrial Service

 3   report it does state on page 4 that he does have a prior

 4   charge in Butts County, Georgia.  According to Mr. Dawodu,

 5   that case was dismissed.  I personally reached out to the

 6   district attorney's office in Butts County.  They had no

 7   record of any case being filed under his name or the citation

 8   number provided.  So at this time I would ask Your Honor to

 9   take notice of that, and that would essentially mean he has no

10   criminal history at all.

11            MR. JONES:  One more thing, Your Honor.  I

12   apologize, but there's also information provided in the

13   Pretrial Services report by this defendant that he exports

14   cars, buys and then exports them, and that can go to his

15   ability to develop business relationships with people in

16   different countries, potentially Nigeria.  With those business

17   connections he could also flee.

18            So I just wanted to make sure that we highlight

19   his -- his claimed . . .

20            THE COURT:  Okay.  Thank you, Mr. Jones.

21            Anything further, Mr. Ray?

22            MR. RAY:  Yes, Your Honor.

23            As the government pointed out, there is a rebuttable

24   presumption.  One, looking at if he is a flight risk, even

25   though that Mr. Dawodu was born in Nigeria, he's lived in
```

1   America for 16 years.  He's been an American citizen for

2   almost a decade.  More importantly, he identifies as an

3   American, and he's proud to be an American citizen.

4           Furthermore, as the evidence was presented here in

5   this hearing today, you know, it appears that this was an

6   elaborate, you know, sophisticated drug operation; however,

7   Mr. Dawodu's role is minimal compared to the other

8   participants.  There's no evidence that he ever conducted any

9   Bitcoin transactions, there's no evidence that he ever owned

10  or has owned any type of cryptocurrency, there's no direct

11  evidence that he's ever accessed the dark web, and there's no

12  evidence suggesting that he, you know, possesses the knowledge

13  or understanding of the entire scope or structure of this

14  operation.  You know, according to the allegations, he's, you

15  know, not much more than just a courier in this operation.

16          And additionally, there's no evidence that

17  Mr. Dawodu has the financial capacity to flee the

18  jurisdiction.  You know, he lived in a small efficiency where

19  he paid a thousand dollars of rent in a month.  The only

20  assets that he owns is his car, he has one piece of jewelry,

21  and he has less than $2000 in his bank account.

22          Furthermore, you know, he has a strong support

23  system here.  Ms. Rochelle Rose has been his friend for 16

24  years.  As I said, she has -- she's an oncology pharmacy

25  technician.  She's willing to open her home to Mr. Dawodu.

1    She's willing to do anything that she can, including be a
2    cosigner on the bond, and she's there to provide not just a
3    home, but also support for him as if she were a family member.

4         And additionally, his girlfriend, Ms. Boule, as I
5    stated earlier, she is attempting to move down to South
6    Florida upon his release.  She's also, you know, is going to
7    be with him at every appearance, whether it's here in southern
8    Florida or it's in the District of Columbia.

9         Also, he does have a sister who lives in the D.C.
10   area.  She lives in Maryland, just right outside of D.C.
11   She's a teacher in D.C., and she has also stated that if he
12   needs to be in D.C. at any time for any appearance, that him
13   and his girlfriend, Ms. Boule, are welcome to stay with her.

14        Furthermore, Mr. Dawodu, he has a college degree.
15   He worked at CVS for over six years as a supervisor, and he --
16   he -- additionally, he's -- I turned in his passport to the
17   federal probation office last week, so he does not have any
18   passport that would enable him to leave the country.

19        And, you know, as to him being a danger to the
20   community, the government points out that he's a danger to the
21   community solely because this is Fentanyl.  I do just want to
22   point out that if the government really thought that this was
23   such a danger, they witnessed over 11, or conducted over 11
24   undercover buys over a six-month period, knowing that Fentanyl
25   was involved, and if it was that big of a danger, I would

1  think that they would have stopped this operation from the
2  beginning.  So, you know, as far as he's a danger, the
3  government can't have it both ways.  The same action that they
4  observed multiple times is the same action they're trying to
5  say right now poses a danger to the community.

6        But he has no -- he has no criminal history, he has
7  no history of violence, he has no history of use of weapon,
8  and there are no allegations that he's a dangerous person.  In
9  fact, he's the opposite.  If you would ask anybody around,
10 they say that he's a loving boyfriend, a brother, son and
11 friend.

12       And at this time, Your Honor, for those reasons we
13 would respectfully ask Your Honor to deny the motion, the
14 government's motion for detention, and I believe that there's
15 a combination of conditions that we discussed earlier that
16 will reasonably assure his appearance and safety of the
17 community.

18       THE COURT:  Thank you.

19       Again, I must determine whether the government's met
20 its burden of proving that no condition or combination of
21 conditions can reasonably assure the defendant's appearance
22 (inaudible) community.  As to appearance, it's the
23 government's burden by a presumption of evidence.  As to
24 danger, it's by clear and convincing evidence.  (Inaudible)
25 the presumption in this case established by the indictment

1  finding probable cause that the defendant committed the

2  charged offense, there is a rebuttable presumption, and the

3  government retains the burden of proof.

4          I've considered the factors in 3142 (inaudible), as

5  with the previous defendant.  I think there are a combination

6  of conditions that I can set, despite the presumption and

7  despite the evidence, that will reasonably assure the

8  defendant's appearance (inaudible).

9          The nature of the offense is quite serious because

10  it does involve Fentanyl and is essentially more serious for

11  Mr. Dawodu as opposed to Mr. Spencer, given the more direct

12  evidence of his handling the Fentanyl pills (inaudible).  So

13  it is a -- certainly it is a serious offense.  The nature and

14  circumstances do involve danger.  I find the weight of the

15  evidence is fairly strong, at least (inaudible) portions of

16  (inaudible) Mr. Dawodu (inaudible).  That said, he has little

17  to no criminal history depending on how this Georgia citation

18  is actually (inaudible).  Even if he was convicted of

19  possession of marijuana, it's a relatively minor offense in

20  the grand scheme of things.

21          While he has ties to Nigeria, he also does have ties

22  to the United States.  He's been here for quite a long time.

23  He is a naturalized citizen and has been so for many years,

24  for about a decade now.  Given his lack of criminal history, I

25  think while there is a danger posed given the nature of the

offense, again, the lack of criminal history suggests that --
or there's no evidence that he would not be deterred by
conditions of bond.  He also does have strong enough ties to
the United States.  While there is the risk of flight to
another country, the conditions that I impose can reasonably
mitigate those risks to ensure the defendant's (inaudible) at
trial.

So based on that finding, I am going to impose a
combination of (inaudible).  I'm going to again impose a
$100,000 personal surety bond, a $100,000 10 percent bond.
Both of those bonds must be cosigned by Rochelle Rose and
Jamilla Boule.  There is a Nebbia condition on the 10 percent
bond.

Mr. Dawodu, listen carefully, because I'm going to
read you the standard and special conditions of your bond.  If
you violate any of these conditions, not only will you end up
back in custody, but you will bring severe financial
consequences on Ms. Rose and Ms. Boule, who are both vouching
for you.

First and foremost, you shall appear before this
Court or the District of Columbia court as directed, whether
remotely or in person as directed.  I would note that if you
fail to abide by that condition, you could also be charged
with a separate crime of failure to appear.

Your travel is restricted to the Southern District

```
1    of Florida and the District of Columbia, but only the District

2    of Columbia for the purpose of court appearances.  You must

3    reside at Ms. Rose's address on 12th Avenue, in Miami, and you

4    will not change that address without prior notice to probation

5    and the Court.

6                You must cooperate with law enforcement in the

7    collection of DNA.

8                While on bond, you must not violate any federal,

9    state or local raw.  If you come in contact with law

10   enforcement, you must contact probation within 72 hours.

11               While on bond, you are going to be (inaudible).  You

12   must surrender any passports that you have.  You may not

13   obtain any passport or other travel documents while on bond.

14               You are to report to Pretrial Services as directed.

15               (Inaudible) the substance abuse counseling as

16   determined by probation, the cost borne by you.  While on

17   bond, you are to abstain from the use of any narcotic drug or

18   controlled substance.

19               You are to avoid all contact with any victims or

20   witnesses in the crimes charged except through counsel.

21   You're also to avoid contact with any co-defendants or

22   co-conspirators except through counsel.

23               While on bond, you must not possess any firearm or

24   destructive device.

25               Neither you nor the women who will be cosigning on
```

```
 1   the bond may pledge, mortgage or otherwise encumber any real
 2   property while you are on bond.
 3            You must not visit any commercial transportation
 4   establishments except as necessary to travel to the District
 5   of Columbia.
 6            You're going to be placed on house arrest subject to
 7   GPS monitoring with the following exception:  You may leave
 8   the home for medical reasons and court appearances or for
 9   attorney visits.
10            Mr. Jones, are there any other conditions that you'd
11   like to recommend as to the bond?
12            MR. JONES:  No, Your Honor.
13            THE COURT:  Ms. Vasquez, anything else you want to
14   recommend or have me clarify?
15            PROBATION OFFICER:  No, Your Honor.  I just need the
16   actual address of where he's going to be residing.
17            THE COURT:  Mr. Ray, correct me if I'm wrong.  I
18   believe it's 11225 Northeast 12th Avenue, in Miami?
19            MR. RAY:  That is correct, Your Honor.
20            THE COURT:  Is that correct, Mr. Ray?
21            MR. RAY:  Yes, thank you.
22            THE COURT:  And Ms. --
23            PROBATION OFFICER:  Your Honor, I apologize.  I only
24   got 11225 12th Avenue.  I'm having such a hard time hearing
25   you, Your Honor.
```

```
1              THE COURT:  It's in Miami.

2              MR. RAY:  And that's Northeast 12th Avenue.

3              PROBATION OFFICER:  Northeast, okay.

4              THE COURT:  The cost of GPS monitoring will be borne

5    by you if Pretrial determines that you are in a position to

6    afford it.

7              Anything else, Mr. Ray?

8              MR. RAY:  Nothing else, Your Honor.

9              THE COURT:  Mr. Jones, I will grant the government's

10   motion to stay my release order pending the three days to

11   allow the government an opportunity to appeal that order in

12   the District of Columbia.

13             MR. JONES:  Thank you, Your Honor.

14             THE COURT:  I do recognize that we have

15   Mr. Fleischman here, we have Mr. Ray here.  I'm not sure if we

16   need do this for a removal case; however, let me (inaudible)

17   the (inaudible) protection act (inaudible) has not been read

18   in this case.

19             Let me advise counsel for all parties here that I

20   need to remind everyone of the government's disclosure

21   obligations under Brady versus Maryland.  The government has a

22   constitutional duty to disclose any evidence that goes toward

23   the (inaudible) of the defendant's guilt that would reduce the

24   defendant's potential sentence or evidence showing the

25   credibility of a witness.  The defendant is entitled to this
```

```
 1   information without a request.  I hereby order the government
 2   to comply with these obligations.  Failure to timely comply
 3   with Brady obligations could result in serious consequences,
 4   including sanctions against the government, suppression of
 5   evidence, adverse jury instructions, (inaudible) charges,
 6   contempt, or reversal of conviction, as well as professional
 7   consequences for any individual found to have unlawfully
 8   withheld them.
 9           All right.  Is there anything else we need to
10   address as to either Mr. Spencer or Mr. Dawodu?
11           MR. FLEISCHMAN:  No, Your Honor.
12           MR. JONES:  No, Your Honor.
13           MR. RAY:  No, Your Honor.
14           THE COURT:  Thank you all for your appearances
15   today.
16           VOICES:  Thank you, Your Honor.
17       (Proceedings concluded.)
18                        * * * * *
19
20
21
22
23
24
25
```

```
                              *  *  *  *  *

                              I N D E X

Testimony of Sean Hamblet

          Cross by Mr. Fleischman              18

          Cross by Mr. Ray                     30

          Redirect by Mr. Jones               39

                         *  *  *  *  *

                         E X H I B I T S

(None.)

                         *  *  *  *  *

                         CERTIFICATE

     I, Stephen W. Franklin, Registered Merit Reporter, and

Certified Realtime Reporter, certify that the foregoing is a

correct transcript, to the best of my ability, from the

DIGITAL AUDIO RECORDING of proceedings in the above-entitled

matter.

     Dated this 6th day of APRIL, 2021.


     /s/Stephen W. Franklin
     _____
     Stephen W. Franklin, RMR, CRR
```

# UNITED STATES DISTRICT COURT
## FOR THE

### SOUTHERN DISTRICT OF FLORIDA

Case No: 21-6099-STRAUSS
Your Case No:21-CR-00145

**United States of America**

vs                                    **WAIVER OF REMOVAL HEARING**

**Luis Teixeira-Spencer**

**I , Luis Teixeira-Spencer** charged in a proceeding on an **Indictment filed in the District of Columbia in violation of 21:U.S.C.§ 846 Conspiracy To Possess With Intent To Distribute Fentanyl and** having been arrested in the **Southern District of Florida (Fort Lauderdale**) and taken before **United States Magistrate Jared M. Strauss**, for that district, who informed me of the charge and of my right to retain counsel or request the assignment of counsel if I am unable to retain counsel, and to have a removal hearing or execute a waiver thereof, do hereby waive a hearing before the aforementioned Magistrate Judge and consent to the issuance of a Warrant for my Removal to the **District of Columbia** where the aforesaid charge is pending against me.

Wednesday  March  31st,  2021

................................................
Signature of defendant

.....................................................................
**Jared M. Strauss**
**United States Magistrate Judge (3/31/2021)**

cc: All Counsel

# UNITED STATES DISTRICT COURT

| SOUTHERN | District of | FLORIDA |
|---|---|---|

| UNITED STATES OF AMERICA<br>vs.<br>LUIS TEIXEIRA-SPENCER | COMMITMENT TO ANOTHER DISTRICT |
|---|---|
| | 21-6099-STRAUSS |

| DOCKET NUMBER | MAGISTRATE JUDGE CASE NUMBER |
|---|---|

| District of Arrest | District of Offense | District of Arrest | District of Offense |
|---|---|---|---|
| DISTRICT OF COLUMBIA | 21-CR-00145 | SOUTHERN DISTRICT OF FLORIDA | 21-6099-STRAUSS |

**CHARGES AGAINST THE DEFENDANT ARE BASED UPON AN**

X  Indictment   ☐ Information   ☐ Complaint   ☐ PETITION

charging a violation of  21        **U.S.C. § 846**

**DISTRICT OF OFFENSE:**

DISTRICT OF COLUMBIA

**CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE FENTANYL**

**CURRENT BOND STATUS:**

☐ Bail fixed at                            and conditions were not met
☐ Government moved for detention and defendant detained after hearing in District of Arrest
☐ Government moved for detention and defendant detained pending detention hearing in District of Offense
☐ Other (specify)  Government's Motion for Emergency Review and Appeal GRANTED order attached ****

| **Representation:** | X Retained Own Counsel | Federal Defender Organization | ☐ CJA Attorney | ☐ None |
|---|---|---|---|---|

| **Interpreter Required?** | ☐ No | Yes | Language: ENGLISH |
|---|---|---|---|

**SOUTHERN DISTRICT OF FLORIDA**

TO: THE UNITED STATES MARSHAL

You are hereby commanded to take custody of the above named defendant and to transport that defendant with a certified copy of this commitment forthwith to the district of offense as specified above and there deliver the defendant to the United States Marshal for that District or to some other officer authorized to receive the defendant.

| 4/19/2021 | |
|---|---|
| Date | United States Judge or Magistrate Judge |

**RETURN**

This commitment was received and executed as follows:

| DATE COMMITMENT ORDER RECEIVED | PLACE OF COMMITMENT | DATE DEFENDANT COMMITTED |
|---|---|---|
| | | |

| DATE | UNITED STATES MARSHAL | (BY) DEPUTY MARSHAL |
|---|---|---|
| | | |

107

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES OF AMERICA,**

v.

**LUIS MIGUEL TEXEIRA-SPENCER,** ✔✔
**and OLATUNJI DAWODU,**

**Defendants.**

Crim. No. 21-145 (JDB)

---

## MEMORANDUM OPINION

Defendants Luis Miguel Teixeira-Spencer and Olatunji Dawodu are charged via indictment with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. The charges stem from defendants' involvement in a narcotics trafficking conspiracy which used darknet websites[1] to distribute pills pressed with fentanyl by mail. Following their arrests and a joint detention hearing, a magistrate judge on the United States District Court for the Southern District of Florida ordered both defendants released pending trial and stayed the release order pending appeal. The government now asks this Court to review the magistrate judge's decision and order defendants detained pending trial. For the reasons stated below, the Court concludes that no condition or combination of conditions of release will reasonably assure defendants' appearance and the safety of the community if the defendants are released pending trial, and hence will order them detained.

### Background

On February 22, 2021, a grand jury returned an indictment charging defendants Spencer

---

[1] Darknet markets are commercial websites that are set up as "hidden services" and can only be accessed using the Tor network, which requires installing Tor software. Darknet markets function primarily as black markets for illicit goods and bitcoin is the most common payment method. See Indictment [ECF No. 1] ¶¶ 2–3.

1

and Dawodu with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi). See Indictment.[2] These charges arise from defendants' participation in a narcotics trafficking conspiracy which involved using darknet websites to distribute pills pressed with fentanyl via the U.S. Postal Service ("USPS"). Id. ¶¶ 8–12. The government's proffer in support of pretrial detention is described below.

The Federal Bureau of Investigation ("FBI") and other law enforcement agencies conducted a criminal investigation of a darknet market vendor that operates the moniker "johncarter7." See Gov't's Mem. at 1.[3] From around February 2017 until May 2020, johncarter7 sold pills pressed with fentanyl on several darknet markets, including AlphaBay, Wall Street, Dream, and Empire. Id. As certain darknet sites were shut down, the vendor turned to new markets. Id. at 1–2. Records indicate that johncarter7 sold more than 67,700 pills across the four darknet markets and more through the encrypted messaging application Jabber, receiving payment in bitcoin. Id. at 2.

While investigating johncarter7, law enforcement found that three of the vendor's darknet sites used the same encryption key and embedded within each key was the same email address. Id. That email address was the recovery address for an account on a bitcoin exchange

---

[2] Additionally, on March 1, 2021, a grand jury returned an indictment in Case No. 21-CR-163 charging Dawodu and a third individual, Alex Ogando, with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. See Indictment [ECF No. 3], United States v. Dawodu, 21-CR-163 (D.D.C.). That indictment arose from a related investigation of fentanyl pills sold on the darknet site PolarSprings. See Gov't's Mem. for Pretrial Detention ("Gov't's Mem.") [ECF No. 7] at 1 n.2. Following a detention hearing on April 8, 2021, Magistrate Judge Harvey ordered Ogando detained pending trial. See Min. Entry (Apr. 8, 2021), United States v. Ogando, 21-CR-163 (D.D.C.).

[3] The Court will cite the government's written proffer, but notes that all of these facts are consistent with the oral proffer given during the detention hearing in the Southern District of Florida. See Tr. of Video Detention & Removal Hr'g Before the Hon. Jared M. Strauss, U. S. Magistrate Judge ("Mag. Hr'g Tr.") [ECF No. 8-1] at 7–16. These facts are also reflected in the "manner and means" and "overt acts" section of the indictment. See Indictment ¶¶ 8–25.

(Localbitcoins.com) with the username "johncarter777." Id. at 3. An individual who traded cash for bitcoin with johncarter777 in-person several times identified Spencer's photograph as depicting the person he met with. Id. That same individual traded bitcoin with Spencer under another handle, and records for that handle include Spencer's name, phone number, and email address. Id. Further, records from another bitcoin exchange (Coinbase) show that bitcoin proceeds from johncarter7 were used on Expedia to pay for a May 2017 hotel stay in Fort Lauderdale, Florida, which was reserved under Spencer's name, phone number, and email address. Id. Moreover, in June and December 2019, an undercover officer bought pills directly from johncarter7 using Jabber, submitting payments to provided bitcoin addresses. Id. at 3–4. Law enforcement traced those payments to an account on a bitcoin exchange (Binance) connected to Spencer and accessed from an IP address in his name and at his residence. Id. at 4.

Law enforcement identified one of Spencer's close contacts as Olatunji Dawodu. Id. Records show nearly 1,500 calls between them from June 17, 2019 to November 15, 2020. Id. Through a pole camera, law enforcement captured Spencer and Dawodu bringing in and taking out boxes from a storage unit in Davie, Florida. Id. Law enforcement also observed them together at Spencer's residence and found messages from Spencer on Dawodu's iCloud account that contained bitcoin wallet addresses. Id. In July and August 2019, law enforcement twice observed Dawodu drop packages containing pills at USPS boxes. Id. After contacting the intended recipients, law enforcement confirmed that the packages were ordered from johncarter7 on Empire and contained fentanyl pills similar to those purchased undercover from johncarter7. Id. at 4–5. Additionally, a confidential human source purchased pills directly from Dawodu several times— including in May and October 2020 and January 2021—that were consistent with the pills in the packages Dawodu dropped at USPS boxes. Id. at 5.

3

On February 23, 2021, following the Indictment, law enforcement executed search warrants at both defendants' residences in Fort Lauderdale. Id. From Dawodu's residence, law enforcement recovered electronic devices, approximately 1,400 grams of pills containing suspected fentanyl, and around thirty USPS mailing envelopes. Id. The pills and packaging were consistent with those from the johncarter7 undercover purchases and the packages law enforcement observed Dawodu drop at USPS boxes. Id. at 7. From Spencer's residence, law enforcement recovered more than $12,000, digital devices, and ledgers. Id.[4]

On that same day, defendants were arrested in the Southern District of Florida. See Arrest (Feb. 23, 2021), United States v. Spencer, 21-MJ-6099 (S.D. Fla.); Arrest (Feb. 23, 2021), United States v. Dawodu, 21-MJ-6100 (S.D. Fla.). During a recorded jail call shortly after his arrest, Spencer directed his girlfriend to "get rid of" laptops that the FBI missed during their search of his residence. Gov't's Mem. at 8. On February 24, 2021, defendants appeared before Magistrate Judge Jared M. Strauss in the Southern District of Florida and were temporarily detained at the government's request. See Min. Entry (Feb. 24, 2021), Spencer, 21-MJ-6099 (S.D. Fla.); Min. Entry (Feb. 24, 2021), Dawodu, 21-MJ-6100 (S.D. Fla.).

After several continuances, Judge Strauss held a detention hearing on March 31, 2021. See Mag. Hr'g Tr. The government provided an oral proffer and testimony by an FBI agent involved in the investigation. Id. Judge Strauss ordered both defendants released pending trial, finding that certain conditions of release could reasonably assure the defendants' appearance and the safety of the community. Id. at 56, 72–73. Specifically, Judge Strauss ordered both defendants released on

---

[4] That same day, law enforcement also executed a search warrant at the Providence, Rhode Island residence of Alex Ogando, Dawodu's co-conspirator in Case No. 21-CR-163 who the government has described as a "known associate" of both Dawodu and Spencer. Gov't's Mem. at 7. From Ogando's residence, law enforcement recovered more than 1,770 grams of pills containing fentanyl, about $370,000, a money counter, electronic devices, and about thirty USPS Priority Mail envelopes with filled pill orders. Id. at 7–8.

4

bond into home detention on GPS monitoring, with Spencer to reside with a cousin and aunt in Providence, Rhode Island and Dawodu with a friend in Miami. Id. at 56–58, 73–75. At the government's request, Magistrate Judge Strauss stayed the release order pending appeal. See id. at 62, 76. Later that day, the government moved for revocation of the release order. See Mot. for Emergency Review & Appeal of Release Order ("Gov't's Mot.") [ECF No. 6]. All parties submitted memoranda on the motion, and the Court conducted a hearing on April 16. The government's motion is now ripe for decision.

## Legal Standard

When a defendant is ordered released by a magistrate judge, the government may file "a motion for revocation of the order or amendment of the conditions of release" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(a)(1). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's release or detention order is subject to de novo review. See United States v. Hunt, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has adopted this view, see United States v. Louallen, 2019 WL 1003531, at *1 (D.D.C. Feb. 27, 2019) (Bates, J.), and the government agrees that this is the appropriate standard, see Gov't's Mot. at 4. See also United States v. Chrestman, -- F. Supp. 3d --, 2021 WL 765662, at *5–6 (D.D.C. Feb. 26, 2021) (Howell, C.J.) (explaining why "both the [Bail Reform Act] and the Federal Magistrates Act support the conclusion, reached by every circuit to have considered question, that a district court reviews a magistrate judge's pretrial release or detention order de novo").

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes

5

that are 'the most serious' compared to other federal offenses." United States v. Singleton, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting United States v. Salerno, 481 U.S. 739, 747 (1987)). Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, id. § 3142(f)(2)(A)–(B). A subset of the types of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses. 18 U.S.C. § 3142(e)(3).

If a defendant is eligible for a detention hearing, the BRA provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019). Pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight. United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987). To justify detention on the basis of dangerousness, the government must establish by clear and convincing evidence that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. United States v. Munchel, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting Salerno, 481 U.S. at 751).

To decide whether pretrial detention is warranted, the court must "take into account the available information concerning" four statutory factors: (1) "the nature and circumstances of the

6

offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).

**Analysis**

To start, defendants are eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(C), which authorizes pretrial detention in cases that involve "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." Defendants do not dispute that the Controlled Substances Act offense charged here meets these criteria. <u>See</u> 21 U.S.C. § 841(b)(1)(A)(vi).

Moreover, because the charged offense here is "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," it triggers a rebuttable presumption that no conditions will reasonably assure the defendant's appearance and protect the community if the Court finds there is probable cause to believe the defendant committed the offense. 18 U.S.C. § 3142(e)(3)(A). The indictment alone establishes probable cause and triggers the presumption. <u>See, e.g.</u>, <u>United States v. Smith</u>, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("The indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). The government may also support that presumption by proffer, <u>id.</u>, and all parties agreed during this Court's detention hearing that the presumption applies.

The Court concludes that defendants have not presented sufficient evidence to rebut the presumption. Moreover, after considering the presumption and the § 3142(g) factors discussed below, the Court concludes that detention is warranted.

### A.    Nature and Circumstances of the Offense

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Here, the offense is extremely serious. A grand jury has found probable cause to believe that defendants were involved in a sophisticated conspiracy to distribute more than 400 grams of a mixture and substance containing fentanyl—which carries a ten-year mandatory minimum and a maximum sentence of life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(vi). As noted above, Congress enacted a statutory presumption in favor of pretrial detention for those charged with serious drug trafficking offenses—demonstrating that Congress recognized the risks posed by such defendants. Furthermore, the quantity of fentanyl distributed by johncarter7 greatly exceeds that required for the mandatory minimum; the quantity recovered from Dawodu's residence alone is more than three times the qualifying amount. See Gov't's Mem. at 12. Fentanyl distribution poses a grave danger to the community, especially in recent months. See, e.g., Abby Goodnough, Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows, N.Y. Times (Apr. 14, 2021), https://www.nytimes.com/2021/04/14/health/overdose-deaths-fentanyl-opiods-coronaviurs-pandemic.html (noting that fentanyl is the primary driver for a twenty-nine percent rise in overdose deaths from October 2019 through September 2020 compared with the previous twelve-month period).

Because defendants are subject to a lengthy period of incarceration if convinced, they have an incentive to flee. The circumstances of this offense suggest they might have the means to do so. Defendants have access to virtual currency and are familiar with darknet markets that sell not only drugs but also false identification and weapons. Indeed, during the search of Dawodu's residence, law enforcement recovered a false Illinois driver's license with the name "Jason Richmond." See Suppl. To Gov't's Mem. for Pretrial Det. ("Gov't's Suppl. Mem.") [ECF No. 11]

8

at 1–2.[5] And despite Dawodu's claim that there is no direct evidence of him using cryptocurrency, there is evidence on Dawodu's iCloud of Spencer sending him bitcoin wallet addresses. See Mag. Hr'g Tr. at 41:20–43:19.

While Spencer admits that "the offense was serious given its involvement with Fentanyl," see Spencer's Mem. at 2, Dawodu claims that his role in the alleged conspiracy was "minimal," see Dawodu's Mem. at 2. But the facts disprove Dawodu's assertion: more than 1,400 grams of pills (approximately 12,590 pills) were found in his bedroom and law enforcement observed him both drop packages for johncarter7 and ship pills directly to customers, including a confidential human source. See Gov't's Suppl. Mem. at 2–3.

Hence, the Court finds that the nature and circumstances of the charged offense weigh heavily in favor of detention for both Spencer and Dawodu.

## B.    The Weight of the Evidence

The weight of the evidence that Dawodu and Spencer were involved in the alleged conspiracy is fairly strong. To be sure, the nature of this conspiracy renders prosecution quite difficult. Because the alleged conspiracy involved sophisticated co-conspirators operating on the darknet with virtual currency and encryption tools to evade detection by law enforcement, it is hard to attribute the criminal activities to individuals. But here, as detailed in the background section above, the government has presented ample evidence.

With respect to Dawodu, the government observed him drop packages containing fentanyl pills at USPS boxes whose intended recipient confirmed the pills were purchased from johncarter7. A confidential source purchased fentanyl pills directly from Dawodu, and approximately 1,400

_____

[5] At the detention hearing, Dawodu's attorney stated that he did not believe the picture on the fake driver's license depicted Dawodu. Regardless of whether it does, Dawodu's possession of any counterfeit identification card suggests he has access to fake identification.

9

grams of pills containing suspected fentanyl and 30 USPS mailing envelopes were found in his residence. Additionally, the government has extensive records of his communications and meetings with Spencer, including their exchange of bitcoin wallet addresses.

As for Spencer, the government linked his email address, photograph, and a hotel reservation made in his name to johncarter7. Law enforcement also traced an undercover purchase of fentanyl from johncarter7 to a bitcoin exchange account connected to Spencer and accessed from an IP address in Spencer's name and at his residence. Further, the search of his residence uncovered a large amount of cash and ledgers. Spencer attempts to cast doubt on the evidence against him by arguing that "[w]hile there were bitcoin transactions linked back to Spencer's bitcoin account and email, the government was not able to say whether a review of the bitcoin transactions matched up with actual dates that drug transactions took place" or "how many people other than Spencer had access to that same bitcoin (Coinbase) account." See Spencer's Mem. at 4 (internal citation omitted). He also argues that no purchasers or informants identified him as a seller, no narcotics were found in his house, and he was never seen with Dawodu during mail drops. Id. The government persuasively rebutted these points in its supplemental memorandum and during the detention hearing. Although Spencer apparently relied on others to mail the narcotics, he played an integral role in the conspiracy. See Gov't's Suppl. Mem. at 4–5. In addition to the evidence already discussed, Spencer purchased bitcoin to pay for orders of at least 610 grams of furanylfentanyl on the darknet site Alphabay in 2016 and searches observed in his email address reflect searches for fentanyl analogues close in time to several of these purchases. Id. at 4. Spencer's IP address records also reveal that he accessed the darknet and encrypted messaging platforms: he connected to the Tor network, which is how darknet markets are accessed, and connected to the Jabber server during the time when johncarter7 was directing customers to

contact the vendor directly via Jabber. Id. at 5. And although Spencer did not sell drugs in-person, he did trade bitcoin for cash in person with a trader who found him using the johncarter777 moniker. Id. Finally, while Spencer was not observed dropping packages with Dawodu, they were observed together carrying packages to and from a storage unit and were in frequent contact. Id.

In sum, this factor weighs in favor of detention, although it "is the least important." See United States v. Gebro, 948 F.2d 1118, 1121–22 (9th Cir. 1991).

### C.    History and Characteristics of the Defendant

Both defendants' history and characteristics are mixed but tilt in favor of detention. As part of this factor, the Court considers defendants' "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Neither defendant has a significant criminal history. In 2017, Spencer pled guilty to one misdemeanor for obtaining money under false pretenses in Rhode Island. See Ex. 1, Spencer's Mem. at 3–4. While the pretrial service report states that Dawodu has a charge in Butts County, Georgia for marijuana possession, the district attorney's office told Dawodu's counsel that no case was ever filed under his name or the citation number provided, and prosecution never commenced. See Dawodu's Mem. at 2; Mag. Hr'g Tr. at 68:2–10. Notably, however, the indictment here charges defendants with a years-long conspiracy that was able to evade detection by law enforcement by using electronic tools designed specifically to conceal illegal activity.

Both defendants have significant ties to both the United States and foreign countries. While Spencer is from Cape Verde and has no legal status in the United States, he has been here since he was eleven years old. Spencer's Mem. at 3. He has a girlfriend in South Florida, and a cousin and

aunt in Rhode Island whom he would reside with if released. Id.; Mag. Hr'g Tr. at 49:13–14. But his mother is in Cape Verde, Mag. Hr'g Tr. at 54:2–3, and he has an immigration detainer currently in place. See Ex. 1, Gov't's Mem. [ECF No. 7-1]. While Spencer has sought to remain here through the DACA program, and says he will fight deportation, he may not be given the choice. See Mag. Hr'g Tr. at 55:21–56:1. Spencer argues that his immigration detainer actually "takes away any risk of flight because Spencer first must obtain a ruling [from] DHS, at a minimum, which grants him an immigration bond prior to even being able to be released in the instant case on bail." Spencer's Mem. at 3. This argument is unavailing because if this Court orders Spencer released and he then receives an immigration bond, he could still flee to avoid prosecution in this case. Moreover, Spencer's call to his girlfriend after his arrest, in which he directed her to get rid of laptops the FBI inadvertently left behind, suggests that he is willing to obstruct justice.

Dawodu was born in Nigeria but came to the United States in 2005 and has been a naturalized citizen since 2011. See Dawodu's Mem. at 2. He has close friends in South Florida, including a friend he would reside with if released, a girlfriend in Atlanta, and a sister in Maryland. Id. at 2–3. But he has substantial ties to Nigeria, too, including his parents and siblings who live there. See Mag. Hr'g Tr. at 67:11–16. He also buys and exports cars, suggesting possible business relationships with people abroad. Id. at 68:11–17. Dawodu claims that he is not a flight risk because he voluntarily surrendered his passports to a probation officer on March 29, 2021 and because he does not have the financial resources to flee. Id. at 3. Yet agents discovered his fake driver's license, which suggests an attempt to evade law enforcement and raises the possibility he could flee using false identification. See Gov't's Suppl. Mem. at 1–2. And because Dawodu has exchanged bitcoin wallet addresses with Spencer, he might very well have access to virtual currency.

12

Hence, while both defendants have limited criminal histories and the Court believes they wish to remain in the United States, their flight risk cannot be dismissed given their foreign ties, possible access to the darknet and cryptocurrency, history of evading law enforcement, and incentive to flee. The Court therefore concludes that both defendants' history and characteristics counsel against release.

### D.    Nature and Seriousness of the Danger

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires "an 'open-ended assessment of the "seriousness" of the risk to public safety.'" United States v. Cua, Crim. A. No. 21-108 (RDM), 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (quoting United States v. Taylor, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).

As set forth above, defendants' role in a large-scale fentanyl distribution conspiracy showed an obvious disregard for the safety of others. Fentanyl is extraordinarily dangerous and this operation distributed a massive amount. Congress recognized the high risk of recidivism for those involved in serious drug offenses by creating a statutory presumption in favor of detention, and defendants have not presented any compelling evidence to rebut that presumption here. Defendants argue that they have no history of violence. See Dawodu's Mem. at 2; Spencer's Mem. at 4. Even if true, that does nothing to allay the dangers stemming from fentanyl distribution.

This Court respectfully disagrees with Magistrate Judge Strauss's conclusion that there is a combination of conditions that can be imposed to reasonably assure the safety of the community. See Mag. Hr'g Tr. at 56, 72. As Judge Strauss acknowledged, Spencer poses a "substantial risk" of continuing his criminal activity on home detention "because he was apparently able to conduct

13

all of the alleged activity from his home and through the dark net, which is difficult to monitor." Id. at 56:2–7. And while Dawodu's activity involved leaving the home to travel to USPS drop boxes, he could become involved with a different part of the conspiracy or direct others to drop packages for him. The Court disagrees with Judge Strauss's view that "the lack of criminal history involved suggests . . . there's not substantial evidence here that [defendants are] not going to be deterred by the significant conditions of bond." Id. at 56:7–11. Fentanyl sales are lucrative and defendants' use of cryptocurrency, the darknet, and encrypted applications over a lengthy period of time demonstrate their ability to operate the conspiracy without detection out of their homes. No combination of conditions could effectively mitigate that danger. Even if pretrial services can monitor internet use to some extent, it has no meaningful way to prevent defendants from using sophisticated tools to evade detection. For example, as the government suggested during the detention hearing, defendants could access the darknet or virtual currency using devices owned by others in their households. Indeed, Judge Strauss did not impose any internet restrictions at all precisely because he was "not sure" how defendants' access to darknet services could "actually be monitored." Id. at 60:1–10.

Because there is a significant risk that defendants will continue their criminal activity on home detention, they pose a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. See Munchel, 2021 WL 1149196, at *4 (quoting Salerno, 481 U.S. at 751). Therefore, in addition to finding by a preponderance of evidence that there is a risk of flight, the Court finds by clear and convincing evidence that both defendants pose a substantial prospective threat to the community.

### Conclusion

For the reasons explained above, the Court finds that all four statutory factors weigh in

favor of pretrial detention. Therefore, the Court will grant the government's motion for emergency review and appeal of release order, and order defendants detained pending trial. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: April 19, 2021

15

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES OF AMERICA,**

v.

**LUIS MIGUEL TEXEIRA-SPENCER,**

**Defendant.**

**Crim. No. 21-145-1 (JDB)**

---

## ORDER

Upon consideration of [6] the government's Motion for Emergency Review and Appeal of Release Order, the evidence proffered and arguments presented in connection with the government's motion, including at the detention hearing held on April 16, 2021, the entire record herein, the factors enumerated in 18 U.S.C. § 3142(g), and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [6] the government's Motion for Emergency Review and Appeal of Release Order is **GRANTED**; it is further

**ORDERED** that defendant Luis Miguel Teixeira-Spencer shall be detained pending trial; it is further

**ORDERED** that defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; it is further

**ORDERED** that defendant be afforded reasonable opportunity for private consultation with counsel; and it is further

**ORDERED** that the person in charge of the corrections facility in which defendant is confined shall deliver the defendant to the United States Marshals Service which shall transport

1

defendant forthwith to the District of Columbia for further proceedings in this matter.

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>April 19, 2021</u>

2

# U.S. District Court
# Southern District of Florida (Ft Lauderdale)
# CRIMINAL DOCKET FOR CASE #: 0:21–mj–06099–JMS–1

Case title: USA v. Teixeira–Spencer

Date Filed: 02/24/2021

Date Terminated: 04/19/2021

Assigned to: Magistrate Judge Jared
M. Strauss

**Defendant (1)**

| | | |
|---|---|---|
| **Luis Miguel Teixeira–Spencer** | represented by | **Jack Albert Fleischman** |
| 31362–509 | | Fleischman & Fleischman, P.A. |
| *YOB 1989 English* | | 2161 Palm Beach Lakes Blvd |
| *TERMINATED: 04/19/2021* | | Suite 403 |
| | | West Palm Beach, FL 33409 |
| | | 561–585–3666 |
| | | Fax: 561–471–8343 |
| | | Email: fflaw@yahoo.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Sidney Zale Fleischman** |
| | | Fleischman & Fleischman PA |
| | | 800 E Broward Boulevard |
| | | Suite 402 |
| | | Fort Lauderdale, FL 33301 |
| | | 954–523–7223 |
| | | Fax: 954–523–4840 |
| | | Email: sf@ffjustice.com |
| | | *ATTORNEY TO BE NOTICED* |

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Opening)** | |
|---|---|
| None | |

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level
(Terminated)**

None

**Complaints**                                              **Disposition**

21:846=CD.F Conspiracy to PWID
Fentanyl

---

**Plaintiff**

**USA**                              represented by   **Trevor Christopher Jones**
                                                      DOJ–USAO
                                                      500 E. Broward Blvd.
                                                      Ste 7th Floor
                                                      Ft. Lauderdale, FL 33394
                                                      786–564–9109
                                                      Email: trevor.jones@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/23/2021 | | | Arrest of Luis Miguel Teixeira–Spencer (dd) (Entered: 02/24/2021) |
| 02/24/2021 | 1 | | Magistrate Removal of Indictment from District of Columbia Case number in the other District 1:21–cr–00145 as to Luis Miguel Teixeira–Spencer (1). (dd) (Entered: 02/24/2021) |
| 02/24/2021 | 2 | | PAPERLESS NOTICE OF HEARING as to Luis Miguel Teixeira–Spencer Initial Appearance – Rule 5(c)(3)/40 set for 2/24/2021 11:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (dd) (Entered: 02/24/2021) |
| 02/24/2021 | 3 | | ORDER UNSEALING INDICTMENT from District of Columbia as to Luis Miguel Teixeira–Spencer. Signed by Magistrate Judge Jared M. Strauss on 2/24/2021. *See attached document for full details.* (dd) (Entered: 02/24/2021) |
| 02/24/2021 | 4 | | Minute Order for proceedings held before Magistrate Judge Jared M. Strauss: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Luis Miguel Teixeira–Spencer held on 2/24/2021. Detention Hearing set for 3/3/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. Removal Hearing set for 3/3/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (Digital 12:51:11) Signed by Magistrate Judge Jared M. Strauss on 2/24/2021. (dd) (Entered: 02/24/2021) |
| 02/24/2021 | 5 | | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Jack Albert Fleischman appearing for Luis Miguel Teixeira–Spencer (Fleischman, Jack) (Entered: 02/24/2021) |
| 03/02/2021 | 6 | | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Sidney Zale Fleischman appearing for Luis Miguel Teixeira–Spencer *(co–counsel)* (Fleischman, Sidney) (Entered: 03/02/2021) |
| 03/02/2021 | 7 | | PAPERLESS NOTICE OF HEARING as to Luis Miguel Teixeira–Spencer |

| | | | |
|---|---|---|---|
| | | | ***RESET DUE TO QUARANTINE** Detention Hearing set for 3/10/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. Removal Hearing set for 3/10/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (dd) (Entered: 03/02/2021) |
| 03/11/2021 | 8 | | PAPERLESS ORDER as to Luis Miguel Teixeira–Spencer (1). The Pretrial Detention hearing previously scheduled for March 10, 2021, will be reset by separate order at the Parties' request. See Case No. 21–6100–STRAUSS ECF No. 11, requesting a continuance in a related case, representing that counsel for Defendant had no objection to his hearing being reset as well. The undersigned finds good cause for the continuance based on counsel's illness and also finds the time between today's date and the reset hearing is excludable under the Speedy Trial Act in the interests of justice. Signed by Magistrate Judge Patrick M. Hunt on 3/11/2021. (PMH) (Entered: 03/11/2021) |
| 03/11/2021 | | | Hearing as to Luis Miguel Teixeira–Spencer: Detention Hearing reset for 3/24/2021 10:30 AM in Fort Lauderdale Division before FTL Duty Magistrate. (tw) (Entered: 03/11/2021) |
| 03/23/2021 | 9 | | PAPERLESS ORDER as to Luis Miguel Teixeira–Spencer (1). The Pretrial Detention hearing previously scheduled for March 24, 2021, will be reset by separate order at the Parties' request. See Case No. 21–6100–STRAUSS ECF No. 14, requesting a continuance in a related case, representing that counsel for Defendant had no objection to his hearing being reset as well. The undersigned finds good cause for the continuance and also finds the time between today's date and the reset hearing is excludable under the Speedy Trial Act in the interests of justice. Signed by Magistrate Judge Patrick M. Hunt on 3/23/2021. (PMH) (Entered: 03/23/2021) |
| 03/26/2021 | | | Set Hearing as to Luis Miguel Teixeira–Spencer: Detention Hearing set for 3/31/2021 AT 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (at) (Entered: 03/26/2021) |
| 03/26/2021 | | | Set Hearing as to Luis Miguel Teixeira–Spencer: Removal Hearing set for 3/31/2021 AT 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (at) (Entered: 03/26/2021) |
| 03/30/2021 | 10 | | HEARING EXHIBITS *for detention hearing* 1,2 by Luis Miguel Teixeira–Spencer (Fleischman, Jack) (Entered: 03/30/2021) |
| 03/31/2021 | 11 | | Minute Order for proceedings held before Magistrate Judge Jared M. Strauss: Detention Hearing as to Luis Miguel Teixeira–Spencer held on 3/31/2021. Witness FBI Agent Sean Hamblet testified. Bond recommendation/set: Luis Miguel Teixeira–Spencer (1) $150,000 PSB & $100,000 10% WITH NEBBIA. Government request a Stay for three days. Court grants request, stayed pending Appeal. INS Detainer lodged. (Digital 10:41:11–12:49:25)<br><br>It is ORDERED AND ADJUDGED that pursuant to the Due Process Protections Act, the Court confirms the obligation of the United States to produce all exculpatory and impeachment evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and orders it to do so. Failing to do so in a timely manner may result in consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or sanctions by the Court. (Signed by Magistrate |

| | | | Judge Jared M. Strauss on 3/31/2021). (at) (Entered: 03/31/2021) |
|---|---|---|---|
| 04/06/2021 | 12 | | TRANSCRIPT of Video Detention and Removal Hearing as to Luis Miguel Teixeira–Spencer held on 3/31/21 before Magistrate Judge Jared M. Strauss, 1–78 pages, Court Reporter: Stephen Franklin, 305–523–5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/27/2021. Redacted Transcript Deadline set for 5/7/2021. Release of Transcript Restriction set for 7/6/2021. (hh) (Entered: 04/07/2021) |
| 04/19/2021 | 13 | | WAIVER OF REMOVAL HEARING by Luis Miguel Teixeira–Spencer (at) (Entered: 04/19/2021) |
| 04/19/2021 | 14 | | COMMITMENT TO ANOTHER DISTRICT as to Luis Miguel Teixeira–Spencer. Defendant committed to District of District of Columbia.. Closing Case for Defendant. (Signed by Magistrate Judge Jared M. Strauss on 4/19/2021). *(See attached document for full details).* (at) (Entered: 04/19/2021) |